CHALFONTE CONDOMINIUM APARTMENT ASSOCIATION, INC., Plaintiff,

v.

QBE INSURANCE CORPORATION, Defendant.

No. 06–81046–CIV–MIDDLEBROOKS/JOHNSON.

United States District Court, S.D. Florida.

Nov. 19, 2007.

Daniel S. Rosenbaum, John Marcus Siracusa, Cheryl Lynn Rosenbaum, Becker & Poliakoff, P.A., West Palm Beach, FL, for Plaintiff.

Anthony Joseph Mcnicholas, III, Wicker Smith O'Hara McCoy & Ford PA, Naples, FL, Catherine Deborah Bain, Ronaflor E. Smith, C. Deborah Bain PA, North Palm Beach, FL, Constantine Georgalis Nickas, Wicker Smith O'Hara McCoy et al, Miami, FL, Frank J. Ingrassia, William S. Berk, Berk Merchant & Sims PLC, Coral Gables, FL, Shelley H. Leinicke, Wicker Smith Tutan O'Hara McCoy Graham & Ford, Fort Lauderdale, FL, for Defendant.

## ORDER

DONALD M. MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon Defendant's Motion to Alter or Amend Judgment to Apply Hurricane Deductible (DE 176), Plaintiff's Response (DE 191), and Defendant's Reply (DE 201). Additionally, a hearing was held on October 17, 2007, to address this issue.

### I. Background

This case was brought by Chalfonte Condominium Apartment Association against QBE Insurance Corporation seeking recovery of damages caused by Hurricane Wilma, and allegedly covered under an insurance policy issued by QBE. The case was tried from August 20 through August 29, 2007, wherein the jury found that Chalfonte had suffered $8,140,099.68. As a part of its claim, Chalfonte sought to invalidate the policy deductible of $1,605,653.00. Specifically, Chalfonte asserted that the deductible provision violated Section 627.701(4)(a) of the Florida Statutes, which states: "Any policy that contains a separate hurricane deductible *must* on its face include in boldfaced type no smaller than 18 points the following statement: 'THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RE-

SULT IN HIGH OUT–OF–POCKET EXPENSES TO YOU.' " (emphasis added).

During trial, I deferred ruling on this issue of whether the deductible would apply even if the statute had been violated. The jury was provided with a special interrogatory in the verdict form which read: "Did the Insurance Contract in this case include the required hurricane deductible statement, in boldface type no smaller than 18 points, pursuant to the requirements of Section 627.701(4)(a) of the Florida Statutes?" The jury answered this question "No" (DE 165). The jury made no further finding on this point.

The question before me now is whether or not QBE's failure to comply with Section 627.701(4)(a) renders the policy's deductible provision void, which in turn depends on how the statute is interpreted. At trial, Chalfonte presented testimony sufficient to determine that the font size used in the actual policy was 16.2, as opposed to the requisite 18.[1] Other than this slight difference in size, the only other deviation from the statute appears to be that QBE used the term "windstorm" as opposed to "hurricane losses." On September 6, 2007, I filed a Final Judgment for Plaintiff (DE 166) in the amount of $8,140,099.68. In this Final Judgment, I neglected to address how the jury's finding that QBE had violated the statute impacted the award for Chalfonte, and did not apply the deductible to reduce the damages.

In its Motion, QBE requests that the Final Judgment for Plaintiff be altered or amended to apply the hurricane deductible of $1,605,653.00, reducing the verdict from $8,140,099.68 to $6,534,446.68. QBE contends that the statute's font size requirement is permissive and/or that QBE substantially complied with the requirements of the statute. Essentially, what QBE appears to be arguing is that it either did not violate the statute because small deviations from the requirements do not result in a violation, or, in the alternative, that if it did violate the statute, the penalty for this violation should be minimal because it substantially complied with the requirements.

In response, Chalfonte requests that the Final Judgment for Plaintiff not be altered, arguing that the Court correctly found that the deductible should not apply. Chalfonte contends that QBE violated the statute on two grounds: (1) the font size did not meet the statutory minimum and (2) QBE used the word "windstorm" instead of "hurricane losses." Essentially, what Chalfonte appears to be arguing is that QBE violated the statute and the penalty for that violation should be voiding the entire deductible.

## II. Analysis

Section 627.701(4)(a) does not explicitly state what constitutes a violation and what the penalty, if any, should be for such a violation. Moreover, no Florida state court has interpreted this precise section of the Insurance Code. Thus, I am left with no choice but to make a reasoned guess at how this statute should be interpreted. I do so cautiously, mindful that when federal courts interpret a state law, they are merely guessing at how the Florida state courts would interpret it and are often wrong. As the Eleventh Circuit has noted, "[w]hen we write to a state law issue, we write in faint and disappearing ink." *Sultenfuss v. Snow*, 35 F.3d 1494, 1504 (11th Cir.1994)(en banc) (Carnes, J., dissenting) *(quoted in D. Bruce Mcmahan v. Toto*, 311 F.3d 1077, 1079 (11th Cir. 2002)).

In making this reasoned guess about what constitutes a violation and what the

---

**1.** QBE complied with the requirement that the language be in boldface.

penalty should be for a violation, I rely on several areas of the law for guidance. In deciding whether or not QBE violated Section 627.701(4)(a), I will use some basic rules of statutory construction to determine what standard of compliance the statute requires. Then, in determining what penalty to apply for a violation of the statute, I will look at the statute in the context of the Insurance Code as a whole. Finally, I will turn to two Florida appellate court decisions on similar statutes to see what guidance they might provide.

**A. The plain meaning of the statute indicates that Section 627.701(4)(a) is mandatory.**

First, I will address whether or not QBE violated Section 627.701(4)(a). The jury found that QBE failed to comply with the requirements of Section 627.701(4)(a), but this failure to comply with the requirements does not necessarily mean that QBE violated the statute. Whether or not QBE failed to comply depends on what standard of compliance the statute requires. Chalfonte argues that the statute is mandatory and requires a strict compliance standard. Under this standard, any violation, no matter how small, would constitute a violation of the statute. QBE, on the other hand, urges the Court to adopt a permissive or substantial compliance standard. Under these standards, a small violation of the statute would not result in a violation of the statute. As long as QBE substantially complied with the statute's requirements, there would be no violation.

According to Florida law, the first consideration of statutory construction is looking at the plain meaning of the statute. *See Clines v. State,* 912 So.2d 550, 556 (Fla.2005) (citations omitted). "Sometimes it is also the final [consideration]." *Id.* "When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, [...] the statute must be given its plain and obvious meaning."

*A.R. Douglass, Inc. v. McRainey,* 102 Fla. 1141, 1144, 137 So. 157 (Fla.1931) *(cited in Florida Dept. of Corrections v. Abril,* 2007 WL 3024020 (Fla.2007)). For a statute to be unambiguous, it need only be plain to anyone reading it that the statute encompasses the conduct at issue. *See Salinas v. U.S.,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Moreover, the plain meaning of a word can usually be ascertained by reference to a dictionary. *Zold v. Zold,* 911 So.2d 1222, 1229 (Fla.2005).

There is nothing ambiguous about Section 627.701(4)(a). The statute clearly states that when there is a separate hurricane deductible, insurance companies "must" include the required statement on the face of the policy in a certain font size and in boldfaced type. By referencing a dictionary, one can ascertain the plain meaning of the term "must"; it means "compulsion, obligation, or requirement" and it does not allow for any discretion. *See Mallory v. Harkness,* 895 F.Supp. 1556, 1563–64 (S.D.Fla.1995) (citing Webster's New World Dictionary, p. 969 (College Edition, 1964)).

The general rule is that, in the absence of any contrary legislative intent, the words "must" and "shall" connote that a statute is mandatory and requires strict compliance, while the word "may" connotes that a statute is merely permissive. 82 C.J.S. Statutes § 368 (for statutory construction purposes, "must" and "shall" are similar); *see The Florida Bar v. Trazenfeld,* 833 So.2d 734 (Fla.2002). Under Florida law, mandatory language is usually only construed as permissive where the statute is constraining the behavior of public officers or entities, creating constitutional concerns. *See Lomelo v. Mayo,* 204 So.2d 550 (Fla. 1st DCA 1967) (holding that mandatory words specifying the amount of time within which duties of public officers are to be performed may be

construed as directory only); *Belcher Oil Co. v. Dade County*, 271 So.2d 118 (Fla. 1972) (holding that even though statute used mandatory words to command municipality to levy equal taxes on competitors, statute was construed as permissive so as not to violate constitutional requirements).[2] As Section 627.701(4)(a) is not directed at any public officers or entities, it is clear that the legislature, by using mandatory language, intended for the statute to be strictly complied with. Thus, QBE violated the statute by not putting the language in the proper font size and by substituting the word "windstorm" for "hurricane losses."

**B. There is no express penalty attached to Section 627.701(4)(a) and the Court declines to create one.**

While the 627.701(4)(a) clearly requires insurance companies to strictly follow its command, the legislature did not provide an express penalty for what, if anything, should happen if its command is violated. In analyzing the meaning of the statute's silence with regard to a penalty, first it must be pointed out that throughout the Insurance Code[3], the legislature has in many sections expressly included penalties for violations of the Code. *See State v. Negrin*, 306 So.2d 606, 607 (Fla. 1st DCA 1975)("statutes must be read *in para materia* with other related statutes and other related portions of the same statute").

In several sections, the legislature expressly states that a violation of the statute results in the policy provision being rendered invalid and/or void. *See, e.g.,* Section 627.6474 (stating that "[a]ny contract provision that violates this section [about health insurance provider contracts] is void."); Section 627.415 (stating that "[a]ny policy provision in violation of this section [about charter, bylaw provisions] is invalid.").

The legislature also provides for other kinds of penalties aside from voiding the provision. In some sections, the legislature crafts specific remedies for the insurance company's noncompliance. For example, in Section 627.410(e), the legislature made the penalty for failing to meet the filing requirements, allowing the Department of Insurance to "order the insurer to discontinue the issuance of policies for which the required filing was not made, until such time as the office determines that the required filing is properly submitted." It also allowed the Department of Insurance to issue this penalty "in addition to any other penalty authorized by law." Section 627.410(e).

The legislature has also on occasion made the penalty a fine from the Department of Insurance. *See, e.g.,* Section 624.310(5) (allowing the Department of Insurance to impose a fine "against any person found in the proceeding to have violated any provision of the Insurance Code"); Section 624.4211 (allowing the Department

---

**2.** There is California case suggesting that lack of a penalty for noncompliance may be yet another factor in deciding that mandatory language should be construed as permissive. *Alexander B. v. Sacramento County Dept of Health and Human Services*, No. C039584, 2003 WL 122289, at *2 (Cal.App.3d Dist. Jan. 13, 2003)(finding that even though statute used mandatory words, statute was merely directory because it did not also provide for a penalty for noncompliance and because it was directed against a court). However, there is

no indication that the Florida courts have adopted this reasoning. *See State v. Goode*, 830 So.2d 817, 823–24 (Fla.2002)(finding that the absence of an explicit penalty did not allow the court to ignore the mandatory language provided in the statute).

**3.** The Florida Insurance Code comprises Chapters 624–632, 634, 635, 636, 641, 642, 648, and 651 of the Florida Statutes. *See* Section 624.01.

of Insurance to impose a fine on an insurance company instead of suspending or revoking a certificate of authority).

In several places, the legislature has expressly stated that even if the insurance company does not comply with the statute, the policy is still valid. Section 627.637 states that if any insurer in Florida writes a health insurance contract in a form that is not in compliance with the statute, the contract remains valid and "shall be construed as though its term and provisions were in conformity with [the requirements] of this chapter."

Most notably, in Section 627.418(1), the legislature seems to suggest that in the absence of an express penalty, courts should assume that a policy provision is valid despite noncompliance with the Insurance Code. Specifically, Section 627.418(1) states that:

[a]ny insurance policy, rider, or endorsement otherwise valid which contains any condition or provision not in compliance with the requirements of this code shall not be thereby rendered invalid, except as provided in s.627.415, but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this code.

While Section 627.418(1) may have been intended to benefit policyholders and not insurance companies, its language is general and appears to apply to the statute at issue in this case. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 942 (Fla., 1979)(holding that where the Department of Insurance has not detected a violation in a policy, "Section 627.418 is designed to guarantee that the courts not bar coverage to policy holders because their contracts contain a condition or provision which violates the [I]nsurance [C]ode").

These express penalty provisions that appear throughout the Insurance Code suggest three things: (1) that the legislature is perfectly capable of crafting an express penalty for Section 627.701(4)(a); (2) in the absence of an express penalty, the legislature may have intended for the deductible to be valid pursuant to Section 627.418(1); and (3) even if the legislature did not intend to make the deductible valid in the event of a violation of the statute, it would be difficult for this Court to craft a penalty that makes the deductible invalid. On this last point, it would be difficult because there are so many different kinds of penalties available. Thus, despite the parties' focus on whether or not to void the deductible, a perusal of the Insurance Code indicates that the penalty does not have to be voiding the deductible provision; for example, it could be some kind of monetary fine from the Department of Insurance.

Thus, this Court declines to supply a penalty for Section 627.701(4)(a) where the legislature did not. It declines to do so because the legislature is perfectly capable of supplying one, because there appears to be a statute that states that in the absence of an express penalty, the provision should be valid, and because there is no good reason for selecting one penalty over another. Moreover, the Florida Supreme Court has in other contexts supported the notion that courts "cannot provide a remedy where the legislature has failed to do so." *Jolley v. Seamco Laboratories, Inc.,* 828 So.2d 1050, 1051 (Fla. 1st DCA 2002)(court declined to provide a remedy for a violation of Florida's Wrongful Death Act); *see Carter v. Dep't of Prof'l Regulation, Bd. of Optometry,* 633 So.2d 3, 6 (Fla.1994) (finding that if legislature had intended the penalty for a violation of a time limit to be dismissal of the administrative complaint, it would have ex-

pressly included that sanction within Section 455.225, and applying the harmless error rule).

Lastly, this Court points out that this result does not seem to contradict the legislature's intent in enacting the statute. *See generally* Restatement (Second) of Torts § 874A cmt. c (1979) (stating that when a statute proscribes certain activity, but does not provide a remedy if there is a violation, it is often helpful to look at the intent of the legislative body that enacted the statute). Several paragraphs below the section at issue in this case, Section 627.701(6)(a) states that "[i]t is the intent of the Legislature to encourage the use of higher hurricane deductibles as a means of increasing the effective capacity of the hurricane insurance market in this state and as a means of limiting the impact of rapidly changing hurricane insurance premiums." It appears that the legislature is trying to encourage the use of deductibles and thus a harsher penalty, such as one voiding the deductible, may not be in line with this stated intent.

## C. The Florida appellate court cases do not provide much guidance.

Now I turn to the Florida appellate court cases. As I already stated, there is no Florida state court decision interpreting Section 627.701(4)(a) of the Florida Statutes. There are, however, two Florida appellate court decisions which interpret statutes with similar language, each resulting in an opposite conclusion. The statutes interpreted are similar to the one in the case at hand because both include language that seems to require that insurance companies to strictly comply, but neither expressly states what the penalty is for noncompliance.

In *Roberts*, the First District Court of Appeal affirmed a trial court's holding that an insurance policy's coinsurance clause was void because it did not comply with

Section 627.701(1). *United States Fire Insurance Company v. Roberts*, 541 So.2d 1297, 1298 (Fla. 1st DCA 1989). Section 627.701(1) states in part:

(1) A property insurer may issue an insurance policy or contract covering either real or personal property in this state which contains provisions requiring the insured to be liable as a coinsurer with the insurer issuing the policy for any part of the loss or damage by covered peril to the property described in the policy only if: (a) The following words are printed or stamped on the face of the policy, or a form containing the following words is attached to the policy: "Coinsurance contract: The rate charged in this policy is based upon the use of the coinsurance clause attached to this policy, with the consent of the insured."

In *Roberts*, the policy did not contain the required statement anywhere in the document, either on the face of the policy or in an attached form. *Id.* at 1299.

As a result, even though the statute did not expressly state it, the *Roberts'* Court found that the statute must be strictly complied with and that the coinsurance clause was therefore void. *Id.* In reaching this conclusion about the penalty, the *Roberts'* Court relied heavily on the legislative history of Section 627.701(1). Section 627.701(1) used to contain a statement that made the penalty for violating the statute voiding the provision. *Id.* (the statute used to state "any such clause or provision shall be null and void, and of no effect unless" the required statement was on the face of the policy or in an attachment). The legislative history also indicates that when the legislature amended Section 627.701(1), it did not intend for any substantive changes; it was merely attempting to clarify the statute. *Id.*

The case before this Court can easily be distinguished from *Roberts*. Section 627.701(4)(a), the section addressing hurricane deductibles, unlike Section 627.701(1)(a) which addresses coinsurance, has never contained an express penalty. Thus, the *Roberts'* Court's stated reason for applying the penalty of voiding the entire provision does not apply to Section 627.701(4)(a). Moreover, the language in 627.701(1)(a) implies that a possible penalty for violating it would be voiding the provision because it states that insurance companies can *only* make the insured a coinsurer *if* certain requirements are met. So if the requirements are not met, it logically follows that the insurance company cannot make the insured a coinsurer. The language in Section 627.701(4)(a), on the other hand, does not imply any particular penalty for not following its requirements.

In *Prida*, the Third District Court of Appeal upheld *per curiam* a trial court's finding that a statute's font size requirement was merely permissive, and that a violation of it did not require voiding the provision. *Prida v. Transamerica Insurance Finance*, 651 So.2d 763, 764 (Fla. 3d DCA 1995). Section 627.848(1)(b) [4] which is about notices canceling insurance contracts after the insured has defaulted states:

Every notice of cancellation shall include, in type or print of which its face shall not be smaller than 12 points, a statement that, if the insurance contract or contracts provide motor vehicle liability insurance required by the financial responsibility law, proof of financial responsibility is required to be maintained continuously for a period of 3 years, pursuant to chapter 324, and the operation of a vehicle without such financial responsibility is unlawful.

In *Prida*, while the insurance company included the required statement and put it in a contrasting red color, it violated the statute by using 9.5 point font, as opposed to 12 point font. *Id.* Just like the statute at issue in *Roberts* and the statute at issue in this case, the statute in *Prida* uses mandatory language, but does not expressly state what the consequences of violating the statute are.

While factually the *Prida* case is quite similar to the case at hand, it, like the *Roberts* case, cannot be relied on. The problem with the *Prida* case is that the Third District Court of Appeals provides absolutely no explanation for why it adopts a permissive standard when the statute uses the word "shall." Moreover, for this Court to follow the *Prida* ruling without being able to justify the reasons for doing so would be extremely problematic, especially in light of the fact that such a permissive standard would essentially render the Section 627.701(4)(a) meaningless. *See State v. Goode*, 830 So.2d 817, 824 (Fla. 2002) (stating that courts should avoid statutory interpretations which would render a portion of a statute meaningless) (citations omitted).

The concurrence in *Prida* recognized this flaw. The concurrence agreed with the result of the *per curiam* opinion, but based its agreement, not on the idea that the statute is permissive, but instead on evidence that the insurance company substantially complied with the statute. *Prida*, 651 So.2d at 763. Specifically, the concurrence found that the required language was prominently displayed, the color was a contrasting red, and the type size was the largest in the entire cancellation notification. *Id.* Unfortunately, the concurrence also does not explain its reasoning for relying on a substantial compliance standard.

4. Section 627.848(1)(b) used to be Section 627.848(3).

Thus, these two Florida appellate cases, despite their similarities, provide very little guidance on how to interpret Section 627.701(4)(a), as the first one is easily distinguishable, and the second one does not explain its reasoning.

### III. Conclusion

Based on a plain meaning reading of Section 627.701(4)(a) of the Florida Statutes, the statute is mandatory and requires strict compliance. Thus, QBE violated it by not putting the required language in the proper font size and by using the term "windstorm" instead of "hurricane losses." However, in the absence of an express penalty for this violation, this Court declines to provide one. Therefore, the hurricane deductible is not void and should be applied to the amount of damages awarded to Plaintiff. Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant's Motion to Alter or Amend Judgment to Apply Hurricane Deductible (DE 176) is GRANTED. The Final Judgment (DE 166) shall be amended to exclude the amount of the deductible ($1,605,653.00). When the opinion on Defendant's Motion for Judgment Notwithstanding the Verdict (DE 172) is entered, an Amended Final Judgment shall also be entered.

DONE AND ORDERED.

### *ORDER ON PREJUDGMENT INTEREST*

THIS CAUSE comes before the Court upon Plaintiff's Motion to Amend Final Judgment to Include Prejudgment Interest and Incorporated Memorandum of Law (DE 171), Defendant's response (DE 192), and Plaintiff's reply (DE 203). Additionally, a hearing was held on October 17, 2007, to address this issue, and after the hearing both parties filed a new set of prejudgment calculations pursuant to the Court's Ore Tenus Order (DE 215 and 218).

### I. Background

This case was brought by Chalfonte Condominium Apartment Association against QBE Insurance Corporation seeking recovery of damages caused by Hurricane Wilma, which were allegedly covered under an insurance policy issued by QBE. The case was tried from August 20 through August 29, 2007, wherein the jury found that Chalfonte had suffered $8,140,099.68 in damages. $7,868,211.00 was awarded for breach of contract, $2,000,000.00 of which was an award for "Ordinance or Law Coverage." Another $271,888.68 was awarded for breach of the implied warranty of good faith and fair dealing. On September 6, 2007, I filed a Final Judgment for Plaintiff (DE 166) in the amount of $8,140,099.68. In this Final Judgment, I did not address Chalfonte's entitlement to prejudgment interest under Florida law.

In its Motion and at the hearing, Plaintiff requests that this Court amend the Final Judgment to include prejudgment interest on the $7,868,211.00 that the jury awarded Chalfonte for its breach of contract claim. Plaintiff argues that in making the prejudgment calculation, the Court should use the date of the Hurricane, October 24, 2005, or in the alternative, the Court should use the date that Chalfonte submitted its damage estimate to QBE and put QBE on notice of its loss, December 18, 2005.

In its response, QBE argues that Chalfonte's motion should be denied in its entirety, or in the alternative, that any prejudgment interest awarded to Chalfonte should be calculated using a later commencement date, namely the date that Chalfonte submitted its sworn proof of loss, July 12, 2006. Additionally, QBE argues that any prejudgment interest awarded to Chalfonte should be calculated based on a lower figure, taking into account the

fact that Chalfonte was already awarded damages for the delayed payment under the contract.

## II. Analysis

There are several issues before me on this Motion. The first issue is whether or not Chalfonte is entitled to prejudgment interest. Assuming Chalfonte is entitled to prejudgment interest, the other two remaining issues are what date and what amount of money I should use to calculate the prejudgment interest.

### A. Entitlement

██ Chalfonte is entitled to prejudgment interest. In diversity cases, federal courts should follow state law governing the award of prejudgment interest. *See, e.g., Seb S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir.2007). Under Florida law, "when a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla.1985). After the verdict liquidates the damages, the trial court should calculate the prejudgment interest using the interest rate set by the legislature; this is a "purely ministerial duty of the trial judge." *Id.;*

██ It is clear that Chalfonte is entitled to prejudgment interest. Even QBE concedes that if Chalfonte is entitled to final judgment in its favor, Chalfonte is also entitled to prejudgment interest. QBE argues that Chalfonte is not entitled to final

judgment in its favor and cites to its Motion for judgment notwithstanding the verdict and/or judgment in its favor as a matter of law (DE 167). However, because QBE's Motion is denied, as set forth in a separate Order, both parties would agree that Chalfonte is entitled to prejudgment interest. Thus the only issues remaining for me to decide are what date should be used and what amount of money the interest should be applied to.

### B. The Date

There are three plausible commencement dates which the Court could use to calculate the amount of prejudgment interest owed to Chalfonte: (1) the date of the loss, i.e. the date of Hurricane Wilma, October 24, 2005; (2) the date the insurance company was put on notice of the loss, i.e. the date that Chalfonte submitted Mr. Labadie's damage estimate through public adjuster Mr. Sarasohn, December 18, 2005; and (3) the date of submission of the sworn proof of loss, i.e. July 12, 2006.[1] As stated above, Chalfonte argues for either of the former dates, while QBE argues for the latter date.

██ The general rule about when the prejudgment interest begins to accrue is that "interest on a loss payable under an insurance policy is recoverable from the time payment is due under the terms of the policy." *Independent Fire Ins. Co. v. Lugassy*, 593 So.2d 570, 572 (Fla. 3d DCA 1992); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 117 F.3d 1328, 1341–42 (11th

---

**1.** Although the parties did not directly address the issue of whether the calculation should be made from the date that Chalfonte sent the proof of loss to QBE or from the date that QBE actually received the proof of loss, there appears to be some dispute about it. In its Notice of prejudgment calculation submitted pursuant to the Court's Ore Tenus Order (DE 218), QBE suggests that the sworn proof of loss date should be July 18, 2007, rather than July 12, 2007. However, because this particular issue was not raised earlier, there is no evidence in the record as to when QBE received the sworn proof of loss. Thus, I will use the earlier July 12, 2007, date which the parties appeared to agree on at the hearing on October 17, 2007.

Cir.1997)(holding that prejudgment interest should accrue from date payment became due under policy, not from the date of loss); *Columbia Cas. Co. v. Southern Flapjacks, Inc.,* 868 F.2d 1217, 1219 (11th Cir.1989) (holding that prejudgment interest should accrue from date that the proceeds would have been due under the insurance policy, not from date of appraisal's completion); *Warren v. Old Dominion Ins. Co.,* 465 So.2d 1376 (Fla. 5th DCA 1985); *Berkshire Mutual Ins. Co. v. Moffett,* 378 F.2d 1007 (5th Cir.1967).

However, there may be some exceptions to the general rule that the terms of the policy govern: (1) where insurer denies liability; and (2) where sworn proof of loss was never submitted. *Independent Fire Ins. Co. v. Lugassy,* 593 So.2d 570, 572 (Fla. 3d DCA 1992)(holding that prejudgment interest should be calculated from the date of loss, not the date that the sworn proof of loss was received by insurance company, because insurer denied liability for loss under the policy); *Underwriters Ins. Co. v. Kirkland,* 490 So.2d 149, 153–54 (Fla. 1st DCA 1986)(holding that prejudgment interest should be calculated from date of loss because no sworn proof of loss needed to be submitted due to the fact that the insured property was completely destroyed by fire); *Ocean Harbour South Condominium Assoc. Inc. v. Empire Indemnity Ins. Co.,* 2007 WL 1059577 *1 (S.D.Fla.2007)(holding that prejudgment interest should be calculated from date insurer was constructively put on notice because no sworn proof of loss was submitted); *Lumbermens Mut. Cas. Co. v. Percefull,* 638 So.2d 1026 (Fla. 4th DCA 1994) *[Lumbermens I]* (holding that prejudgment interest should be calculated from date insurer was constructively put on notice because no sworn proof of loss was submitted). In these exceptional situations, the insurance company may be liable for the prejudgment interest from either the date the loss occurred or the date

the insurance company was put on notice of the loss, despite a policy provision stating that sworn proof of loss should be used.

Neither exception applies to Chalfonte. The first exception, stating that where the insurer has denied liability, the insured is entitled to prejudgment interest accruing from the date of loss, appears to no longer be good law. In *Golden Door,* the Eleventh Circuit recognizes that the Florida Supreme Court may have implicitly overruled the holding from the 1992 *Lugassy* case, which gives rise to this exception, in a subsequent case called *Lumbermens II,* decided in 1995. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.,* 117 F.3d 1328, 1341 (11th Cir.1997); *Lumbermens Mut. Cas. Co. v. Percefull,* 638 So.2d 1026 (Fla. 4th DCA 1994) *[Lumbermens I]; Lumbermens Mut. Cas. Co. v. Percefull,* 653 So.2d 389 (Fla.1995) *[Lumbermens II]; Ocean Harbour South Condominium Assoc. Inc. v. Empire Indemnity Ins. Co.,* 2007 WL 1059577 *1 (S.D.Fla.2007)(discussing the fact that *Lugassy* was implicitly overruled by a subsequent line of cases). Thus, this exception is not a viable option for Chalfonte.

Chalfonte also does not fit into the second exception, stating that where sworn proof of loss was never submitted, courts may use another date, either the date of loss or the date the insurer was constructively put on notice of the total loss. In all of the cases where this second exception applies, the insured did not submit a sworn proof of loss, either because it was not possible or because it was never requested, so the courts were forced to use another date of commencement. *See Kirkland,* 490 So.2d at 153–54; *Ocean Harbour,* 2007 WL 1059577 at *1; *Lumbermens I,* 638 So.2d 1026. In the case at hand, Chalfonte did submit a sworn proof

of loss which can be used by this Court to determine the date from which the prejudgment interest should accrue. Because neither exception applies to Chalfonte, Chalfonte falls under the general rule that prejudgment interest begins to accrue from the date the payment became due under the policy.

Chalfonte argues that the date the payment became due under the policy is not a good commencement date because QBE did not require Chalfonte to submit a sworn proof of loss and because Chalfonte only submitted one to move the process along. In Chalfonte's policy with QBE under the section entitled "Duties In The Event Of Loss Or Damage," the policy states:

> You must see that the following are done in the event of loss or damage to Covered Property ... (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days of our request. We will supply you with the necessary forms.

However, the Eleventh Circuit, as well as another judge in the Southern District of Florida, have already found this attempt to distinguish from the general rule to be without merit. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.*, 117 F.3d 1328, 1341 at n. 9 (11th Cir.1997) (stating that insureds' argument that a different date should be used because they were not required to submit a proof of loss was meritless); *Ocean Harbour South Condominium Assoc. Inc. v. Empire Indemnity Ins. Co.*, 2007 WL 1059577 at *3 (S.D.Fla.2007)(the policy contained identical language to the case at hand and the court found that the obligations between the parties were mutual and insurer's failure to request did not relieve insured of the obligation to establish the magnitude of its loss).

Having determined that the date the payment became due under the policy is the correct date to use in calculating the prejudgment interest, the Court will use the date 20 days after July 12, 2006, which is August 1, 2006 as the commencement date for its calculation of prejudgment interest.

## C. The Amount

■ The third issue before me is what amount of money to use for the prejudgment interest calculation. Chalfonte would like the starting figure to be $7,868,211, the amount of money which the jury awarded to Chalfonte for its breach of contract claim. QBE would like the Court to apply a "setoff" to this amount. More specifically, QBE argues that the Court should subtract $405,809 from the $7,868,211 figure. The $405,809 represents the amount of interest that Chalfonte had to pay on the multi-million dollar loan that it took out to cover the cost of repairs to the windows and sliding glass doors while waiting for payment from QBE. In addition to awarding Chalfonte $7,868,211 for the breach of contract claim, the jury also awarded Chalfonte $271,888.68 for breach of the implied warranty of good faith and fair dealing. Presumably some of the $271,888.68 figure is compensation for the loan interest. According to QBE, allowing Chalfonte to calculate the prejudgment interest based on the $7,868,21 figure, when it was already compensated for the loan interest through the jury's award, would constitute an impermissible windfall and/or a double recovery for Chalfonte because it was already reimbursed by the jury for the loan interest.

The Court finds QBE's argument to be without merit. In its reply, Chalfonte points out that it only recovered $271,888.86 for the loan interest so it is disingenuous for QBE to argue that Chal-

fonte already recovered $405,809. Chalfonte also points out that obtaining prejudgment interest on the $7,868,211 figure does not include any of this loan interest money. Moreover, Chalfonte argues, and the Court agrees, that the loan interest money is different and distinct from the prejudgment interest that Chalfonte is entitled to. The loan interest money that the jury awarded to Chalfonte was compensatory in nature and is related to Chalfonte's breach of implied warranty of good faith and fair dealing, whereas the prejudgment interest is about withheld money under the contract.

Thus the loan interest money will not be subtracted from the amount used to calculate prejudgment interest. However, there is an another adjustment that needs to be made to the $7,868,211 figure. As set forth in another Order on Defendant's Motion to amend the final judgment (DE 176), I am finding that the award for breach of contract should be reduced by the amount of the deductible. Instead of using $7,868,211, I will use the $6,262,558 figure, which is the amount awarded by the jury minus the deductible.[2]

### III. Conclusion

Applying the prejudgment interest on the breach of contract award minus the deductible ($6,262,558), beginning on August 1, 2006, and using the statutory interest rate agreed upon by the parties and set forth in the law,[3] the total amount owed to Chalfonte in prejudgment interest is $702,777.20.[4] Accordingly, it is hereby

2. $7,868,211.00 (breach of contract award)— $1,605,653.00 (deductible) = $6,262,558.

3. For 2006, the rate is 9% and for 2007, the rate is 11%.

4. This is based on Plaintiff's calculation for prejudgment interest submitted pursuant to the Court's Ore Tenus Order (DE 215): For 2006: $6,262,558 × 9% = $563,630.22.

ORDERED AND ADJUDGED that Plaintiff's Motion to Amend Final Judgment to Include Prejudgment Interest (DE 171) is GRANTED IN PART and DENIED IN PART. The Final Judgment (DE 166) shall be amended to include $702,777.20 in prejudgment interest for Plaintiff. When the opinion on Defendant's Motion for Judgment Notwithstanding the Verdict (DE 172) is entered, an Amended Final Judgment shall also be entered.

DONE AND ORDERED.

$563,630.22–365 = $1,544.19 per day. 152 days (August 1 to December 31, 2006) × $1,544.19 = $234,716.88. For 2007: $6,262,558 × 11% = $688,881.38. $688,-881.38÷365 = $1887.34 per day. 248 days (January 1 to September 6, 2007) = $468,060.32. Total for 2006 and 2007: $234,716.88 (2006) + $468,060.32 (2007) = $702,777.20.