**EL–AD ENCLAVE AT MIRAMAR CONDOMINIUM ASSOCIATION, INC., Plaintiff,**

v.

**MT. HAWLEY INSURANCE COMPANY, Defendant.**

Case No. 09–60726–CIV.

United States District Court, S.D. Florida, Miami Division.

Nov. 22, 2010.

Daniel S. Rosenbaum, John Marcus Siracusa, Mark Gerard Keegan, Richard Chambers Valuntas, Laurel Ruthanne Wiley, Yelizaveta Batres Herman, Rosenbaum Mollengarden Janssen & Siracusa, PLLC, West Palm Beach, FL, Chad Sumner Lucas, Katzman Garfinkel & Berger, Maitland, FL, for Plaintiff.

Thomas E. Tookey, Coral Springs, FL, Brian E. Sims, Michael D. Prough, William C. Morison, Morison Holden Derewetzky & Prough LLP, Walnut Creek, CA, Cortland C. Putbrese, Morison Holden Derewetzky & Prough, LLP, Richmond, VA, Daniel Howard Coultoff, Latham, Shuker, Barker, Eden & Beaudine, LLP, Orlando, FL, Melissa M. Sims, Scott Michael Janowitz, Berk, Merchant & Sims, PLC, Coral Gables, FL, for Defendant.

## Order on Motion for Summary Judgment

ADALBERTO JORDAN, District Judge.

El–Ad Enclave and Mt. Hawley Insurance Company have filed cross-motions for summary judgment. Following oral argument, and for the reasons set forth below, Enclave's motion for summary judgment [D.E. 120] is DENIED, and Mt. Hawley's motion for summary judgment [D.E. 121] is DENIED IN PART and GRANTED IN PART.

### I. Factual Background

In September of 2005, Mt. Hawley issued a property casualty insurance policy to Enclave, a condominium association, with a policy limit of $1 million dollars per incident. The policy period was twelve months, from July 15, 2005, to July 15, 2006. On October 24, 2005, Enclave allegedly sustained substantial damage to the property due to Hurricane Wilma, and it has brought this suit against Mt. Hawley for its alleged failure to pay claims relating to the property damage.

### A. The Insurance Policy

Enclave's policy contains two select provisions that are at issue in this suit.

First, Enclave's policy provides that, in the event of a loss or damage, the company "may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or claim, including an insured's books and records." Further, no legal action may be taken against the insurer, Mt. Hawley, unless "[t]here has been full compliance" with all terms of the policy.

Second, the policy includes a "peril deductible" of "3.00% of total values at risk Per Building (including time element if applicable) at the time of loss for Winstorm or Hail." The policy includes a "scheduled locations endorsement," which provides that the declared value for the insured property is $44 million. Though the insured property consists of multiple buildings, the policy only lists the $44 million aggregate value for the entire property, and does not include a separate schedule providing the value of each individual building.

### B. Enclave's Pre-Suit Compliance

Following Hurricane Wilma, in October of 2005, Enclave's insurance agent submitted a windstorm loss claim to Mt. Hawley. In March of 2006, after one of its adjusters inspected Enclave's property, Mt. Hawley issued a check to Enclave for $11,441.15 (the sum payable after deductibles, according to Mt. Hawley) for the property damage.

On June 26, 2008, counsel for Enclave, Mr. Chad Lucas, sent Mt. Hawley a letter indicating that his firm represented Enclave regarding its claim, and requested information regarding the claim. On January 12, 2009, Enclave provided Mt. Hawley with a sworn proof of loss pertaining to damages caused by Hurricane Wilma.

On February 4, 2009, Mt. Hawley sent Ms. JenniLynn Lawrence, counsel for Enclave, a letter indicating that it wanted to schedule an examination under oath ("EUO"), and delineating several requests for documents that it wanted Enclave to produce in advance of the EUO. On February 18th, Ms. Lawrence responded that Enclave "would be happy to make [its] corporate representative ... available at [her law firm's] offices ... on a mutually convenient date." Further, she indicated that Enclave was "in the process of finding out how many documents there are so that [Mt. Hawley] could determine how it wished to proceed." Subsequently, on April 16, 2009, Ms. Lawrence sent Mt. Hawley another letter, stating that Enclave's corporate representative would be available for the EUO on May 26th. The letter also informed Mt. Hawley that Enclave had produced approximately twenty boxes of documents, and asked whether Mt. Hawley wanted Enclave to make copies of the documents or if they would be inspected in person. On May 7, 2009, Ms. Lawrence sent Mt. Hawley a letter confirming that the document inspection would take place on May 19th, and that the EUO would follow on May 28th. On May 11, 2009, Enclave requested that the EUO be rescheduled to May 27th, which Mt. Hawley approved. On June 2nd, the EUO was rescheduled one final time to June 9, 2009.

On May 15, 2009, before it had produced the documents or appeared for the EUO, Enclave filed this suit.

## II. LEGAL STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *see Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the nonmovant." *See United of Omaha Life Ins. v. Sun Life Ins. Co.,* 894 F.2d 1555, 1558 (11th Cir.1990).

## III. ANALYSIS

Enclave seeks partial summary judgment on two separate grounds: (a) that the windstorm deductible in the policy is void; and (b) that the windstorm deductible is $30,000. Mt. Hawley seeks summary judgment on two issues as well: (a) that Enclave's failure to provide requested documents and submit to an EUO prior to filing suit violates a condition precedent for the filing of an action, thereby barring Enclave's claims; and (b) that the wind-

storm deductible on the policy applies on a "per building" basis at 3% of the insured value of each building. I will first address whether Enclave's claims are barred due to its alleged failure to comply with pre-suit conditions, and then examine the policy deductible.

### A. ENCLAVE'S COMPLIANCE WITH THE POLICY'S PRECONDITIONS FOR FILING SUIT

Mt. Hawley argues that Enclave was not in "full compliance" with the policy requirement that, in the event of a loss, it produce all requested documents and submit to an EUO *prior* to filing suit. Mt. Hawley contends that these requirements are contractual pre-conditions to a suit, and that, as a result, Enclave's pre-suit non-compliance bars it from maintaining this action.

I agree with Mt. Hawley that policy provisions requiring submission to an EUO are conditions precedent to filing suit. Indeed, Florida courts have consistently held that an insured must comply with an EUO provision in order to maintain an action to recover policy benefits. *See Goldman v. State Farm Fire General Insurance Co.*, 660 So.2d 300, 303 (Fla. 4th DCA 1995) ("We conclude that the policy provisions requiring appellants to submit to examinations under oath are conditions precedent to suit ..."). *See also Shaw v. State Farm Fire and Casualty Co.*, 37 So.3d 329, 332 (Fla. 5th DCA 2010) ("It is undisputed that a provision in an insurance policy that requires the insured to submit to an EUO qualifies as a condition precedent to recovery of policy benefits.") (citation omitted); *Southgate Gardens Condo.*

*Assoc., Inc. v. Aspen Specialty Ins. Co.*, 622 F.Supp.2d 1332, 1335 (S.D.Fla.2008) ("Compliance with provisions requiring EUOs are conditions precedent to suit ...").

■ Here, however, there is a dispute of fact as to whether Enclave was in compliance with the pre-suit conditions of the policy. This is because there is a fundamental distinction between the cases cited by Mt. Hawley—where courts dismissed suits for failure to satisfy the policy preconditions—and what happened here. In the cases cited by Mt. Hawley, the insureds refused to comply with demands for an EUO or simply failed to show for scheduled EUOs, and ultimately never complied with the EUO requirement. In *Goldman*, for example, the insured had yet to submit to an EUO two years after having filed suit. *See Goldman*, 660 So.2d at 305. The Fourth District noted that an insured's *"refusal to comply* with a demand for an examination under oath is a willful and material breach of an insurance contract." *See id.* at 303 (emphasis added). Accordingly, it held that the insured's refusal to comply prohibited a suit concerning the policy. *See id.* at 306. In another similar case cited by Mt. Hawley, the insured failed to show for scheduled EUOs, and never fulfilled the EUO requirement. The Second District held that the insureds' "failure to submit to the EUOs was a material breach of a condition precedent to [the insurer's] duty to provide coverage under the policy." *See AMICA Mut. Ins. Co. v. Drummond*, the *Drummond*, 970 So.2d 456, 459 (Fla. 2d DCA 2007).[1]

---

1. Mt. Hawley also cites *Swaebe v. Fed. Ins.*, 374 Fed.Appx. 855 (11th Cir.2010), in support of its argument. There, the Eleventh Circuit affirmed summary judgment against the insured, who provided its sworn proof of loss— a policy precondition—after filing suit. That case, however, is also distinguishable. In *Swaebe*, the insurer made multiple requests

for the proof of loss before the suit was filed, and ultimately denied the claim because the insured failed to provide documents. *See id.* at 857–58. Conversely, here there was an agreement in place to fully comply with the policy pre-suit requirements before the suit

Conversely, the record here presents a dispute of fact regarding whether Enclave was in compliance with Mt. Hawley's demands for documents and an EUO. Dating back to February 18, 2009, three months prior to filing suit, Enclave amicably attempted to coordinate the production of documents, and indicated that its corporate representative would be available at a "mutually convenient time." On April 16th, a month before filing suit, Enclave informed Mt. Hawley that its representative would be available for an EUO on May 26th, and inquired whether Mt. Hawley wanted copies of the documents it had produced or sought to inspect them personally. Finally, on two occasions prior to May 15th (when Enclave filed suit), the parties agreed to dates for the inspection of Enclave's documents and the EUO.

The parties' confirmed agreement setting dates for the production of documents and the submission of an EUO—an agreement established before Enclave filed suit—creates a question of fact as to whether Enclave was in violation of the "full compliance" requirement. *See Haiman v. Federal Insurance Company*, 798 So.2d 811, 812 (Fla. 4th DCA 2001) (cooperation "to some degree" or providing an explanation for non-compliance with EUO provision creates a question of fact for jury) (citation omitted). *See also Riviera South Apartments, Inc. v. QBE Insurance Corporation*, No. 07–60934–Civ–Cohn, 2007 WL 2506682, at *6 (S.D.Fla. August 30, 2007) (question of fact as to compliance with EUO precondition where plaintiff provided contact information for corporate representative and made him or her available for examination prior to suit).

Moreover, if an insured has not demonstrated willful disregard of the policy preconditions, courts have either stayed the action or dismissed the suit without prejudice in order to allow belated compliance.

was filed, and the conditions were satisfied

*See, e.g., Central Metal Fabricators v. Travelers Indemnity Company of America*, 703 So.2d 1251, 1251 (Fla. 3d DCA 1998) (staying claim pending compliance with EUO); *Southgate Gardens Condominium Association, Inc. v. Aspen Specialty Insur. Co.*, 622 F.Supp.2d, 1332, 1337 (S.D.Fla.2008) (dismissing suit without prejudice to allow belated compliance is "most prudent course of action"). Here, such relief is not necessary because Enclave produced the documents and the EUO was taken less than a month after the action was filed. But regardless, these cases indicate that dismissal is not appropriate here.

Accordingly, summary judgment based upon Enclave's alleged non-compliance with the policy pre-suit conditions is DENIED.

### B. The Windstorm Deductible is Applicable at 3% "Per Building" Basis

The parties both seek summary judgment pertaining to the applicable windstorm deductible for Enclave's claim, and they offer fundamentally different interpretations of the same provision. Mt. Hawley argues that the applicable deductible for the losses claimed by Enclave is 3% of the insured value of each building at the time of Hurricane Wilma on October 24, 2005. On the other hand, Enclave contends that the deductible should be interpreted as 3% of the policy limit of $1 million, or $30,000.

Additionally, Enclave argues that, even if Mt. Hawley's interpretation is correct, such a deductible provision violates Fla. Stat. § 627.701 (as applicable at the time the policy was issued), thereby voiding the deductible.

before Mt. Hawley filed its motion.

### 1. THE WINDSTORM DEDUCTIBLE IS UNAMBIGUOUS

■ The deductible provision at-issue is found in an addendum declaration to the policy. The declaration states that the "peril deductible" is $10,000 per occurrence for all "covered perils," except "3.00% of total values at risk Per Building (including time element if applicable) at the time of loss for Winstorm or Hail," "$50,000 Per Occurrence for Earthquake," and "$50,000 Per Occurrence for Flood." The policy also includes an endorsement providing that the "declared value[ ]" of Enclave's insured property was $44 million; however, the policy does not include a schedule providing the value of each individual building within the insured property.

■ Under Florida law, "insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *See Prudential Prop. & Cas. Ins. v. Swindal*, 622 So.2d 467, 470 (Fla.1993). *See also Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla.2000). Further, "[i]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *See Auto–Owners*, 756 So.2d at 34. Ambiguities in insurance contracts are interpreted against the insurer and in favor of the insured. *See Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla.2003). However, the rule of liberal construction in favor of the insured applies "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction ..." *See State Farm Mutual Automobile Insurance Co. v. Pridgen*, 498 So.2d 1245, 1248 (Fla. 1986). The rule "does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *See id.*

■ In construing an insurance policy, "courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect." *See Auto–Owners Ins. Co.*, 756 So.2d at 34. "[T]erms of an insurance policy should be taken and understood in their ordinary sense, and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced or unrealistic construction." *Siegle v. Progressive Consumers Ins.*, 819 So.2d 732, 736 (Fla.2002) (citation omitted). A provision is not ambiguous simply because it is complex or requires analysis. *See Swire Pac. Holdings*, 845 So.2d at 165. Where no ambiguity exists, the policy shall be construed according to the plain language of the policy as bargained for by the parties. *See Anderson*, 756 So.2d at 33.

Based on the plain language of the deductible provision, I conclude that the only reasonable interpretation is offered by Mt. Hawley: that "a deductible applies to each building, calculated at 3% of the total value of each building." Enclave's alternative interpretation—that the provision should be interpreted as providing a deductible of 3% of the *policy limit*—is simply not reasonable. The policy uses the terms "total coverage limit" and "per occurrence loss limit" to describe or define the "policy limit." Accordingly, if the windstorm deductible was intended to be 3% of the policy limit, then it would have stated that it was 3% of either the "total coverage limit" or the "per occurrence loss limit." The omission of both of these terms from the windstorm deductible language leads to the inescapable conclusion that the deductible was not intended to be premised upon the policy limit. To give credence to Enclave's exceedingly strained interpreta-

tion would be tantamount to re-writing the deductible provision by deleting or rendering superfluous the language "values at risk per building," and including terms that were intentionally omitted. As a result, I agree with Judge Dimitrouleas' decision on same issue. *See Beverly Hills Condominium 1–12, Inc., et al. v. Aspen Specialty Insurance Co.,* No. 06–60980–Civ, 2007 WL 1183939, at *4 (S.D.Fla. April 13, 2007) ("If the policy deductible for windstorm or hail was meant to be a percentage of the occurrence limit, the policy would have used those words rather than the terms 'total insurable values.' ").

Moreover, an examination of the policy as a whole, specifically the other deductible provisions, further renders Enclave's interpretation an unreasonable one. The subject deductible addendum provides deductibles—other than the windstorm deductible—that are based on a fixed monetary amount. In fact, all of the policy's deductibles are based on a set monetary figure per occurrence: the deductible for "all covered perils" is "$10,000 per occurrence," and earthquakes and floods carry a $50,000 per occurrence deductible. Only the windstorm deductible is based upon a percentage of the "total values at risk per building ... at the time of loss." Accordingly, reading the contract as a whole, it is apparent that, when it is intended that a deductible be based upon a fixed monetary sum per occurrence, the policy will simply reflect that intention through express language. If Enclave's interpretation is correct and the windstorm deductible was intended to be $30,000, the policy would have simply provided a deductible of "$30,-

000 per occurrence for windstorm or hail." The fact that the policy does not employ this language, but instead expressly predicates the windstorm deductible upon a percentage of "total values at risk per building," fundamentally undermines Enclave's contention. Simply put, to adopt Enclave's interpretation would be to completely contradict the plain language of the windstorm deductible itself, and to ignore the obvious intent of the policy as a whole. *See Auto–Owners Ins. Co.,* 756 So.2d at 34 ("[C]ourts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect.").

Enclave also asserted in oral argument that there is a dispute of fact regarding the interpretation of this provision because there is no schedule of values for each individual building attached to the policy. I disagree.[2] The policy does not expressly indicate that a schedule of the values of each building is included, nor does it indicate that such a schedule is required at the time the policy is issued. Notably, the language of the windstorm deductible states that it is based upon 3% of the total values at risk per building *at the time of loss,* not at the time that policy was issued. Therefore, the only reasonable interpretation of this language is that an adjuster will calculate the "values at risk per building at the time of loss" after the damage has occurred, based on an estimate of the values when the damage was sustained. In fact, this is the exact manner in which Enclave's initial claim was processed.[3] Moreover, as noted above, the policy does include an endorsement listing the "de-

---

**2.** Though Enclave did not present this argument in its papers, thereby denying Mt. Hawley a fair opportunity to rebut this point, I will briefly address it because I do not find it persuasive.

**3.** On March 2, 2006, Mt. Hawley provided Enclave with a worksheet listing the valua-

tions of the different buildings, and based on that, it created a "loss worksheet" calculating the deductible applicable for each building, its estimate of repair for all the damaged buildings, and the covered loss (subtracting the deductible applicable to each building from the "loss" or damage for each building) [D.E. 57–14].

clared value" of the insured property ($44 million), which would be rendered meaningless under Enclave's interpretation of the policy. Accordingly, the absence of a schedule of the values of each insured building does not create a dispute of fact as to the windstorm deductible's interpretation.

Finally, it should also be noted that Mt. Hawley's interpretation of the policy does not create an absurd result. Enclave suggests that Mt. Hawley's interpretation of the windstorm deductible, based on the building values provided by Mt. Hawley, would provide for a deductible that exceeds the policy limit. This, however, is not a complete or accurate depiction of the policy. As Mt. Hawley correctly notes, this is just one of numerous ways that the deductible provision can be applied. Though in this circumstance the deductible is significant in comparison to the policy limit because of the number of buildings damaged by Hurricane Wilma, that will not always be the case under the terms of this policy. For example, in a situation where building # 1, valued by Mt. Hawley at $2.8 million (at the time of the alleged loss), is significantly damaged, a deductible of $86,000 is neither absurd nor unreasonable. *See id.*

In sum, I conclude that the windstorm deductible is susceptible to only one reasonable interpretation: that the deductible is equal to 3% of the total values at risk per building at the time of loss. Enclave's interpretation is an unreasonable construction of the deductible provision. Accordingly, because the deductible provision is unambiguous, and Mt. Hawley's interpretation is the correct one, Mt. Hawley's motion for partial summary judgment on the interpretation of windstorm deductible is GRANTED.[45]

### 2. THE WINDSTORM DEDUCTIBLE IS NOT VOID PURSUANT TO FLA. STAT. § 627.701

Enclave also argues that the windstorm deductible violates subsections (3)(a) and (4)(a) of Fla. Stat. § 627.701 (2004), and that, as a result, the deductible provision is void and unenforceable. In relevant part, § 627.701 provides:

(3)(a) A policy of residential property insurance shall include a deductible amount applicable to hurricane or wind losses ... no higher than 3 percent of the policy limits with respect to commercial lines residential risks; ...

. . .

(4)(a) Any policy that contains a separate hurricane deductible must on its face include in boldfaced type no smaller than 18 points the following statement: "THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT–OF–POCKET EXPENSES TO YOU." ...

---

4. Because I have determined that Mt. Hawley's interpretation of the windstorm deductible is the only reasonable one, I will not consider the extrinsic evidence offered by the parties. *See RTG Furniture Corp. v. Industrial Risk Insurers*, 616 F.Supp.2d 1258, 1264 (S.D.Fla.2008) (where the insured is a "sophisticated commercial entity," and is involved in the drafting of the insurance contract, it is not entitled to a liberal construction in favor of coverage where an ambiguity exists, and extrinsic evidence is weighed to determine the parties' intent). I will note,

however, that had I considered the extrinsic evidence, particularly the communications between the parties pertaining the application for the policy, the evidence would have supported Mt. Hawley's interpretation of the windstorm provision.

5. Obviously, the value of the buildings damaged pursuant to Enclave's claim, and the amount of the deductible applicable to Enclave's claim, are matters to be determined by the jury.

(8) Notwithstanding the other provisions of this section or of other law, but only as to hurricane coverage as defined in s. 627.4025 for commercial lines residential coverages, an insurer may offer a deductible in an amount not exceeding 5 percent of the insured value with respect to a condominium association or cooperative association policy, or in an amount not exceeding 10 percent of the insured value with respect to any other commercial lines residential policy, if, at the time of such offer and at each renewal, the insurer also offers to the policyholder a deductible in the amount of 3 percent of the insured value.

*See* Florida Stat. § 627.701 (2004).[6]

As an initial matter, I agree with Enclave that § 627.701 applies to this policy. Though Fla. Stat. § 626.913, the Surplus Lines Law applicable to surplus carriers such as Mt. Hawley, was amended in 2009 to provide that § 627 does not apply to surplus lines carriers, there was an exception for lawsuits filed on or before May 15, 2009. Because Enclave filed suit on May 15, 2009, § 627.701 applies to the subject policy.

■■■■ Turning to its specific arguments, Enclave contends that the subject insurance policy violates § 627.701(3)(a), which states that "[a] policy of residential property insurance shall include a deductible

amount applicable to hurricane or *wind losses . . . no higher than 3 percent of the policy limits . . .*" (emphasis added). Enclave argues that the windstorm deductible (which obviously provides a deductible for "wind losses") violates this subsection because it exceeds 3% of the $1 million policy limit. This, argument, however, overlooks the exception set forth in § 627.701(8), providing that notwithstanding the previous sub-sections of the statute, an insurer is authorized to offer a deductible in an amount not exceeding 5% of the insured value with respect to a condominium association, if it also offers a deductible in the amount of 3% of the insured value. This subsection applies here because Enclave's windstorm deductible is 3% of the total values at risk per building at the time of loss, which is less than the maximum deductible authorized by § 627.701(8) (5% of insured value), and meets the requirement that the insurer offer a deductible in the amount of 3% of the insured value. There is no dispute that Mt. Hawley complied with § 627.701(8), and was authorized to issue the policy with the disputed windstorm deductible. Accordingly, the deductible limitation expressed in § 627.701(3)(a) does not apply here.[7]

Enclave also argues that the deductible is void because it does not include the language specified in § 627.701(4)(a) that

---

**6.** The 2004 version of Florida Statute § 627.701 is applicable to Enclave's policy because it was issued before October 1, 2005, the effective date for the 2005 amendments to the relevant provisions above. *See Royale Green Condo. Assn., Inc. v. Aspen Specialty Ins. Co.,* Case No. 07–21404–Civ–Cooke, 2008 WL 2940803, at *1–2 (S.D.Fla. July 28, 2008). *See also Menendez v. Progressive Exp. Ins. Co., Inc.,* 35 So.3d 873, 876 (Fla.2010) ("[W]e look at the date the insurance policy was issued and not the date that the suit was filed or the accident occurred, because 'the statute in effect at the time an insurance contract is executed governs substantive issues arising in

connection with that contract.'") (citation omitted).

**7.** It should be noted that § 627.701(8) applies "only as to hurricane coverage as defined in § 627.4025," which provides that "hurricane coverage" is "coverage for loss or damage caused by the peril of windstorm during a hurricane." *See* §§ 627.701(8), 627.4025(2)(a). The windstorm deductible contained in Enclave's policy seemingly falls within the definition of hurricane coverage. Enclave cannot dispute the application of this subsection to the policy, but then, in turn, contend that subsections (3)(a) and (4)(a) of § 627.701 apply to the windstorm deductible.

must be included in a "separate hurricane deductible." Enclave makes this argument despite the fact that its policy does not technically contain a "separate hurricane deductible," but a deductible for "windstorm or hail" (which would encompass a hurricane). Enclave has not cited any cases where courts have held that a policy that did not contain a separate hurricane deductible, but instead included a general windstorm deductible, was required to include the language set forth in § 627.701(4)(a).

It is, however, unnecessary for me to rule on whether Enclave's policy was·required to comply with this subsection because, even if it was, I cannot render the deductible void and unenforceable based on Mt. Hawley's failure to comply. This is because the statute does not include a penalty provision voiding a deductible for failure to comply with § 627.701(4)(a). I cannot create a penalty provision, voiding the windstorm deductible, where the legislature chose not to do so. *See Chalfonte Condominium Apartment Ass., Inc. v. QBE Insurance Corp.*, 526 F.Supp.2d 1251, 1260 (S.D.Fla.2007) ("[I]n absence of an express penalty for ... violation of [§ 627.701(4)(a) ], this Court declines to provide one. Therefore, the hurricane deductible is not void...."). *See also RTG Furniture Corp.*, 616 F.Supp.2d at 1267 (adopting Judge Middlebrooks' decision in *Chalfonte*, and concluding that the defendant's acknowledged failure to comply with § 627.701(4)(a) does not void the deductible as matter of law). The fact that several other sections of § 627 do indeed provide penalties expressly declaring that "a violation of the statute results in the policy provision being rendered invalid or void,"

creates a strong presumption that the omission of an express penalty for violation of § 627.701 was intentional. *See Chalfonte*, 526 F.Supp.2d at 1256. *See, e.g.*, §§ 627.6474 ("[a]ny contract provision that violates this section is void"), 627.415 ("[a]ny policy provision in violation of this section is invalid").

Moreover, § 627.418(1) states that "[a]ny insurance policy, rider, or endorsement otherwise valid which contains any condition or provision not in compliance with the requirements of this code shall not be thereby rendered invalid ..., but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this code." *See* § 627.418(1). This language, applicable to the statute at issue, confirms that the legislature's failure to supply an express penalty for violation of § 627.701 requires that courts "assume that the policy provision is valid despite noncompliance with the Insurance Code." *See Chalfonte*, 526 F.Supp.2d at 1257.[8]

Accordingly, the policy's windstorm deductible is not void, and Enclave's motion for partial summary judgment on this issue is DENIED.

## IV. CONCLUSION

In sum: (1) there is a dispute of fact as to whether Enclave failed to satisfy the policy preconditions for the production of documents and submission to an EUO before filing suit; (2) Mt. Hawley's interpretation of the windstorm deductible is the correct one as a matter of law; and (3) the windstorm deductible is not void or unenforceable due to alleged violations of Fla. Stat. § 627.701. Accordingly, Enclave's

---

**8.** This also applies to Enclave's argument that the deductible is void due to the policy's failure to comply with § 627.701(3)(a). *See Vision I Homeowners Ass., Inc. v. Aspen Specialty Ins. Co.*, 643 F.Supp.2d 1356, 1362 (S.D.Fla.2009) (denying summary judgment because legislature's omission of penalty for violation of § 627.701(8) does not permit court to void policy deductible).

motion for summary judgment [D.E. 120] is DENIED, and Mt. Hawley's motion for summary judgment [D.E. 121] is DENIED IN PART and GRANTED IN PART.

This case is reset for the two week trial period beginning January 31, 2011. Calendar call will be January 25, 2011.