REVISED MAY 22, 2009

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

April 21, 2009

Charles R. Fulbruge III
Clerk

No. 08-30476

SIX FLAGS INC

Plaintiff - Appellant

v.

WESTCHESTER SURPLUS LINES INSURANCE COMPANY, a corporation; ARCH SPECIALTY INSURANCE COMPANY, a corporation; GREAT LAKES REINSURANCE (UK) PLC, a public limited company; COMMONWEALTH INSURANCE COMPANY, a corporation; AXIS SPECIALTY INSURANCE COMPANY, a corporation; CONTINENTAL CASUALTY COMPANY, a corporation; LIBERTY CORPORATE CAPITAL LTD

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

Six Flags, Inc. appeals the district court's order granting summary judgment in favor of seven of its property insurers. The parties primarily contest whether a sublimit in the relevant insurance policies that applies "as respects Flood" limits the insurers' liability for loss and damage at Six Flags's New Orleans theme park that resulted from flooding associated with Hurricane

Katrina.  The district court held that the sublimit applies to the flood loss and granted partial summary judgment for the insurers.  We affirm in part, reverse in part, and remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-appellant Six Flags, Inc. brings this suit against defendants-appellees Westchester Surplus Lines Insurance Co. ("Westchester"); Arch Specialty Insurance Co. ("Arch"); Great Lakes Reinsurance (UK) PLC ("Great Lakes"); Commonwealth Insurance Co. ("Commonwealth"); Axis Specialty Insurance Co. ("Axis"); Continental Casualty Co. ("Continental"); and Liberty Corporate Capital, Ltd. ("Liberty")[1] (collectively, the "Excess Insurers").  Six Flags asserts that the Excess Insurers insured it against loss that Hurricane Katrina-related flooding caused to its New Orleans theme park.

Six Flags obtained multi-layered, all-risk, first-party property insurance for its domestic theme parks for the period of June 15, 2004, to November 1, 2005.  Six Flags's agent, Marsh, Inc., generated and submitted broker manuscript forms requesting specific types of coverage, clauses, and terms to various insurers.  Marsh placed insurance contracts with the Excess Insurers and other insurance companies that resulted in policies totaling $450 million in combined limits for all insured losses.  The policies provided four distinct layers of coverage:  (1) a primary layer with $25 million in limits; (2) a first excess layer with $50 million in limits; (3) a second excess layer with $125 million in limits; and (4) a third excess layer with $250 million in limits.[2]  Six Flags paid an annual premium of $5,716,927 for this coverage.

---

[1] Liberty is the lead underwriter of Syndicate 190 at Lloyd's of London and the named defendant for that syndicate.  See Corfield v. Dallas Glen Hills, LP, 355 F.3d 853, 863–66 (5th Cir. 2003).

[2] Industrial Risk Insurers ("IRI") was the principal insurer in the primary layer.  Although it is not a party in this case, Six Flags presents evidence and argument regarding IRI's role in drafting clauses at issue here.

The Excess Insurers sold policies to Six Flags (the "Excess Policies") covering all risks within the first and second excess layers—the $25 million to $200 million range—the only layers at issue in this case.[3]  The Excess Policies contain a number of clauses that are relevant to this appeal.  They insure against all risks,[4] subject to certain limits and deductibles.  One such sublimit is "applicable to all loss or damage . . . per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by . . . the Federal Emergency Management Agency" (the "Flood sublimit").[5]  The Excess Policies also contain deductibles, including separate deductibles for the perils of Flood and of a Named Storm.[6]

---

[3] The insurers in the first excess layer were Westchester, Arch, and Great Lakes.  Those in the second excess layer were Commonwealth, Axis, Continental, and Liberty.

[4]  Each of the Excess Policies provides that "[t]his policy insures against all risk of direct physical loss of or damage to covered property while on a described premises herein."

[5] The full text of the Flood sublimit provides:

3)      LIMITS OF LIABILITY
        * * *
        B)      Sublimits (applicable to all loss or damage):
                The liability of [the Excess Insurer] resulting from loss or damage insured against herein shall not exceed:
                * * *
                4)      [$2,500,000 for first-layer excess policies; $27,500,000 for second-layer excess policies] per occurrence and in the term aggregate as respects Flood at any location in a Flood Zone A or V as designated by the Army Corp of Engineers or the Federal Emergency Management Agency (FEMA).

According to FEMA, lands located in Flood Zone A are at high risk of flooding due to their proximity to bodies of water such as lakes and rivers, and lands located in Flood Zone V are at high risk for coastal flooding from tides and waves.  Other sublimits apply per occurrence for Debris Removal and Expediting Expenses and per occurrence as respects Civil or Military Authority, Ingress/Egress, Leader Property, Leasehold Interest, Rental Value, Royalties, Service Interruption, and Valuable Papers & Records.

[6] The Excess Policies state, in relevant part:

5)      PRIMARY POLICY DEDUCTIBLES
        All losses, damages or expenses arising out of any one occurrence shall be  adjusted as one loss, and from the amount of such adjusted loss shall

Most of the Excess Policies define "Flood" as:

1)    A general and temporary condition of partial or complete inundation of normally dry land areas from:
      (a)    the overflow of inland or tidal waters;
      (b)    the unusual and rapid accumulation or runoff of surface waters from any source; or
      * * *
2)    the release of water impounded by a dam;
3)    water that backs up or flows from a sewer, drain or sump;
Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from flood, except loss or damage from resulting Fire, Explosion and Sprinkler Leakage or loss or damage otherwise excluded by this policy.

The Commonwealth policy, however, contains an endorsement (the "Commonwealth Flood definition endorsement") that replaces the definition of Flood with the following statement:

The term "flood" is defined as loss or damage caused by waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. Loss resulting from, contributed to or aggravated by a "flood" caused by a peril not otherwise excluded under this policy shall not be considered in application of the policy "flood" limit or deductible provisions.

Finally, the policies lump together loss within a 72-hour window resulting from a single event into an occurrence for adjusting claims—i.e., for application

---

be deducted:
* * *
E)    5% of the combined Property Damage and Time Element Value at all or part of locations situated within the 100 year recurrence interval for the peril of Flood (with the exception of Six Flags Fiesta Texas), subject to a minimum deductible of $1,000,000 of the deductible in Section A, whichever the greater.
* * *
H)    3% of the combined Property Damage and Time Element Values at all locations for the peril of a Named Storm, subject to a Minimum deductible no less than the deductible in Section A.

of sublimits and deductibles. Relevant to this appeal, the policies define a Weather Cat Occurrence as follows:

> All loss or damage occurring during a period of 72 hours which is caused by or results from a storm or weather disturbance which is named by the National Weather Service or any other recognized meteorological authority.

> Storm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including, but not limited to Flood, wind, hail, sleet, tornadoes, hurricane or lightning.

The Excess Policies were effective on August 29, 2005, when Hurricane Katrina, a storm named by the National Weather Service, struck the Gulf Coast. Hurricane Katrina caused heavy damage to and interrupted the operations of the Six Flags New Orleans theme park located at 12301 Lake Forest Boulevard, New Orleans, Louisiana. Flooding lasting several weeks caused much of the damage to the theme park, although high winds also contributed. Six Flags New Orleans sits within a Federal Emergency Management Agency designated Flood Zone A.

Six Flags submitted losses totaling $150 million to its insurers. Six Flags's primary-layer insurers, including IRI, paid $25 million, exhausting that layer of coverage. The Excess Insurers' adjustor, however, capped their liability at $2.5 million pursuant to the Flood sublimit. The second-layer Excess Insurers paid Six Flags that $2.5 million plus compensation for certain losses resulting from wind damage.

After unsuccessfully protesting the applicability of the Flood sublimit, Six Flags filed the present lawsuit in the district court. It sought a declaratory judgment that the Flood sublimit did not apply to its Hurricane Katrina-related losses and claimed that the Excess Insurers breached the Excess Policies by applying the Flood sublimit to damage covered by the separate peril of a Named Storm. The Excess Insurers filed motions for partial summary judgment

5

pursuant to Rule 56 of the Federal Rules of Civil Procedure, which Six Flags opposed. Six Flags also requested the opportunity to engage in additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

The district court granted the Excess Insurers' motions for partial summary judgment and denied Six Flags's discovery request. The district court concluded that the Flood sublimit is unambiguous: it "specifically limit[s] recovery for Flood in Zone A or V to its respective dollar value per occurrence." Six Flags Inc. v. Westchester Surplus Lines Ins. Co., 535 F. Supp. 2d 744, 755 (E.D. La. 2008). The court emphasized that Flood includes "all loss of damage resulting from flood, and makes only very limited exceptions to this definition . . . . Nowhere in the term Flood or its exceptions is a Named Storm or waters resulting from a Named Storm specifically excluded." Id. at 754. Moreover, the district court determined that the Weather Cat Occurrence provision does not, as Six Flags argued, exclude the applicability of the Flood sublimit. It instead "defines what that 'occurrence' is" and "lumps all losses or damages occurring within a 72-hour period of time into one covered loss for adjustment purposes." Id. at 754–55. The district court thus held that losses from Flood that are part of a Weather Cat Occurrence remain subject to the Flood sublimit.

Because the Excess Policies were unambiguous, the district court declined to review extrinsic evidence that Six Flags presented showing that the insurers did not intend the Flood sublimit to apply to storm loss and therefore denied Six Flags's Rule 56(f) motion. On April 7, 2008, the court entered final judgment for the Excess Insurers.[7] Six Flags now appeals.

## II. DISCUSSION

---

[7] After the district court entered partial summary judgment, Six Flags filed an unopposed motion under Rule 54(b) of the Federal Rules of Civil Procedure for entry of final judgment or, in the alternative, under 28 U.S.C. § 1292(b) for certification of interlocutory appeal. The district court granted Six Flags's Rule 54(b) motion and ordered the remaining coverage disputes to be resolved by an appraiser in private settlement.

## A. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. The court reviews de novo the district court's award of summary judgment. See In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." In re Katrina Canal Breaches Litig., 495 F.3d at 205–06. "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Id. at 206 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## B. Contract Interpretation

The parties agree that Louisiana law governs their dispute. To determine Louisiana law, we look to "the final decisions of the Louisiana Supreme Court." Id. In the absence of such a decision, "we must make an Erie guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case." Id. "In making an Erie guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes." Id. "'Jurisprudence, even when it rises to the level of jurisprudence constante, is a secondary law source in Louisiana.'" Id. (quoting Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co., 179 F.3d 169, 169 (5th Cir. 1999) (footnote omitted)).

Under Louisiana law, "[t]he written instrument, in which a contract of insurance is set forth, is the policy." LA. REV. STAT. ANN. § 22:864. "An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana

Civil Code." Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 580 (La. 2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045. The language of the policy is the starting point for determining that common intent. Elliott v. Cont'l Cas. Co., 949 So. 2d 1247, 1254 (La. 2007); Doerr v. Mobil Oil Corp., 774 So. 2d 119, 124 (La. 2000). "The words of a contract must be given their generally prevailing meaning," and "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. arts. 2046–47. The words, however, are not read in isolation: "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." LA. REV. STAT. ANN. § 22:881.

A provision in an insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations or if the intent of the parties cannot be ascertained from the language employed. Bonin v. Westport Ins. Corp., 930 So. 2d 906, 911 (La. 2006). However, the fact that a term "is not defined in the policy itself, . . . does not make the [term] ambiguous." Am. Deposit Ins. Co. v. Myles, 783 So. 2d 1282, 1287 (La. 2001); accord In re Katrina Canal Breaches Litig., 495 F.3d at 207. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." LA. CIV. CODE ANN. art. 2048. Where an insurance policy includes ambiguous provisions, the "[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 763 (La. 1994) (citing LA. CIV. CODE ANN. art. 2050); Peterson v. Schimek, 729 So. 2d 1024, 1029 (La. 1999).

Relatedly, "[a] provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." LA. CIV. CODE ANN. art. 2049. Finally, in cases of ambiguity, "[t]he court should construe the policy 'to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry.'" La. Ins. Guar. Ass'n, 630 So. 2d at 764 (quoting Trinity Indus., Inc. v. Ins. Co. of N. Am., 916 F.2d 267, 269 (5th Cir. 1990)). Thus, "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE ANN. art. 2053. We apply these principles to the Excess Policies.

## C. The Excess Policies

### 1. Excess Policies Other Than the Commonwealth Policy

The contract provisions in the non-Commonwealth Excess Policies have only one reasonable meaning: the Flood sublimit caps the liability of the Excess Insurers at $2.5 million for all loss or damage per occurrence, including a Weather Cat Occurrence, as respects Flood. The Excess Policies insure against "all risks of direct physical loss of or damage to covered property" subject to specific exclusions not applicable in this case. Within that all-risks coverage, certain limits and sublimits set the Excess Insurers' maximum liability, generally on a per occurrence basis. The Flood sublimit applies "per occurrence in the term aggregate as respects Flood at any location in Flood Zone A or V." The non-Commonwealth Excess Policies define loss from Flood to "include all covered loss or damage to covered property resulting directly or indirectly from . . . inundation of normally dry land areas." The Excess Policies also contain deductibles that apply on a per occurrence basis. The relevant deductible in this case is 3% of the damage for "the peril of a Named Storm."

The parties agree that "Named Storm" and "Weather Cat" are interchangeable terms.

The Excess Policies define "occurrence" in order to explain when sublimits or the deductible apply[8]—not to exclude the applicability of a particular sublimit. Cf. Northrop Grumman Corp. v. Factory Mut. Ins. Co., --- F.3d ----, No. 07-56760, 2009 WL 861475, *9 (9th Cir. Apr. 2, 2009) (holding that "a sensible reading of the primary policy suggests that the terms [Named Windstorm and Wind] were defined to explain when the special Named Windstorm deductible would apply") (citing with approval the district court case at issue here).[9] The relevant definition here is that of the Weather Cat Occurrence. A Weather Cat Occurrence is all loss occurring during a 72-hour period caused by or resulting from, inter alia, Flood, wind, hail, sleet, tornadoes, hurricane, or lightning, associated with or occurring in conjunction with a storm or weather disturbance named by the National Weather Service. Because "Flood" is a weather phenomenon within the Weather Cat Occurrence, the Flood sublimit applies one time per such occurrence to limit loss and damage as respects that Flood. It is undisputed that the Six Flags New Orleans theme park is located in an area designated as Flood Zone A and that Hurricane Katrina was a Named Storm.

---

[8] The Excess Policies provide for the applicability of one deductible "[i]f loss arising out of one Occurrence is subject to any combination of deductibles." As the Excess Policies do not similarly provide a rule for the applicability of a single sublimit but expressly state that each is "applicable to all loss or damage," multiple sublimits may apply to each occurrence. Thus, the losses for, e.g., Debris Removal and Rental Value are separately limited.

[9] Precedent applying Mississippi, Texas, and New York law shows that definitions of occurrences are often used to define the applicability of a sublimit or deductible. See, e.g., Madison Materials Co. v. St. Paul Fire & Marine Ins. Co., 523 F.3d 541, 543 (5th Cir. 2008) (applying Mississippi law to determine whether related acts of embezzlement constituted one or more occurrences for purpose of applying applicable policy limit); U.E. Tex. One-Barrington, Ltd. v. Gen. Star Indem. Co., 332 F.3d 274, 278 (5th Cir. 2003) (applying Texas law to determine whether multiple fires at separate locations constituted one occurrence for purpose of meeting threshold to recover); Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135–37 (2d Cir. 1986) (applying New York law to damage at two different properties to determine applicability of policy limit).

Thus, the Flood sublimit applies to limit the non-Commonwealth Excess Insurers' liability at $2.5 million over the primary-layer insurers' $25 million policy limit for loss or damage resulting from flooding caused by, associated with, or occurring in conjunction with Hurricane Katrina.

Six Flags, however, argues that the Flood sublimit does not apply to Flood loss in a Weather Cat Occurrence because a Named Storm is a distinct peril not subject to the Flood sublimit.[10] As noted above, the Excess Policies provide a deductible that applies to "the peril of a Named Storm." The term "peril" has an industry usage. A "peril" is "[t]he cause of a risk of loss to person or property; esp., the cause of a risk such as fire, accident, theft, forgery, earthquake, flood, or illness." BLACK'S LAW DICTIONARY 1174 (8th ed. 2004). To Six Flags, because a Weather Cat Occurrence undisputedly corresponds to a Named Storm, it offers a "one-stop shop" for insuring all loss resulting from a hurricane—in other words, the Weather Cat Occurrence subsumes all of the other perils defined therein and is subject only to sublimits and deductibles expressly addressed to it. While we have no doubt that the parties could have agreed to such a provision, we cannot reasonably interpret the Weather Cat Occurrence definition to have this meaning.

Six Flags's proposed construction ignores the language of the Excess Policies and disregards the express purpose of defining an occurrence. To start, Six Flags's argument fails to acknowledge that the Flood sublimit applies to loss or damage per occurrence as respects Flood, not "per Flood Occurrence" or "as respects the peril of Flood." Without reference to the terms of the Excess Policies, Six Flags nonetheless asks us to inferentially foreclose the applicability

---

[10] A brief reference in its Reply Brief to the doctrine of "efficient proximate cause" aside, Six Flags does not argue that its loss was not caused by flood—nor can it in light of Tuepker v. State Farm Fire & Casualty Co., 507 F.3d 346, 355 (5th Cir. 2007); Leonard v. Nationwide Mutual Insurance Co., 499 F.3d 419, 437 (5th Cir. 2007); In re Katrina Canal Breaches Litigation, 495 F.3d at 214; and Sher v. Lafayette Insurance Co., 988 So. 2d 186, 194 (La. 2008).

of the "applicable to all loss or damage" Flood sublimit to the "all loss or damage" Weather Cat Occurrence. Reviewing the provisions of the Excess Policies, we conclude that, to give meaning both to the definition of Flood and to "per occurrence" in the Flood sublimit, the only reasonable interpretation is that the Flood sublimit applies across different types of occurrences to loss or damage that falls under the definition of Flood.[11]

In addition, Six Flags's reading avoids recognizing that the definition of an occurrence, which groups certain losses for adjustment purposes, is distinct from the concept of a peril, which is the cause of the loss. Six Flags's proposed construction would transform the definition of a Weather Cat Occurrence into the definition of a Named Storm peril by cross-referencing the non-definitional mention of that peril in the deductible that applies to a Weather Cat Occurrence. We conclude that such a result would conflate the two distinct terms—and is too tenuous to provide a reasonable alternative meaning to the Excess Policies. See Northrop Grumman Corp., 2009 WL 861475, *9; Premier Entm't Biloxi, LLC v. James River Ins. Co., No. 1:06-CV-12, 2007 WL 2908791, *7 (S.D. Miss. Oct. 3, 2007) (holding that a Weather Cat Occurrence was not a separate peril because "although the deductible refers to 'each [Weather Cat Occurrence] as insured against by this policy,'" the "[Weather Cat Occurrence] is never identified as a separate peril").[12]

---

[11] Six Flags's proposed interpretation would suggest implausible outcomes regarding the applicability of other sublimits as well. Notably, the Excess Policies do not distinguish between sublimits that apply to the causes of loss and those that apply to the types of loss. Thus, construing the policies as Six Flags asks would suggest the remarkable result that the sublimits for, e.g., Debris Removal and Service Interruption would not apply to a Weather Cat Occurrence, despite being significant sources of loss in the aftermath of a hurricane.

[12] We give no credence to Six Flags's citation to Pinnacle Entertainment, Inc. v. Allianz Global Risks US Insurance Co., No. 2:06-CV-935, slip op. (D. Nev. Mar. 26, 2008), an unpublished district court decision provided in Six Flags's Record Excerpts. That court in Pinnacle concluded that Flood and Weather Cat Occurrence were distinct perils based on a definitional section in the insurance contract in that case. The court expressly distinguished the contract at issue here as described by the district court below.

Finally, Six Flags asks us to interpret the Excess Policies by applying a presumption in favor of coverage. Article 2056 of the Louisiana Civil Code provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." Because the insurer typically furnishes the text of a policy to the insured, often on its standard form, the Louisiana courts have repeatedly interpreted ambiguous provisions against the insurer and in favor of the insured. See, e.g., Tunstall v. Stierwald, 809 So. 2d 916, 921 (La. 2002) ("The insurer . . . bears the burden of showing policy limits or exclusions." (emphasis added)) (citing Mass. Protective Ass'n v. Ferguson, 121 So. 863, 279–80 (La. 1929) (interpreting a standard form insurance contract)); La. Ins. Guar. Ass'n, 630 So. 2d at 764 ("If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured."); Garcia v. St. Bernard Parish Sch. Bd., 576 So. 2d 975, 976 (La. 1991) ("Equivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured has no voice in the preparation.").

These presumptions, however, do not apply to the Excess Policies in this case. First, article 2056 and its derivative rules of construction are inapplicable to an unambiguous insurance contract. Sharp v. Fed. Sav. & Loan Ins. Corp., 858 F.2d 1042, 1046 (5th Cir. 1988) ("[W]e have already demonstrated that this contract is not ambiguous, and therefore even giving the contract a strict construction we would reach the same result."); Calcasieu-Marine Nat'l Bank of Lake Charles v. Am. Employer's Ins. Co., 533 F.2d 290, 296 (5th Cir. 1976) ("The special rules of interpretation do indeed apply only when there is an ambiguity; . . . [t]his is so even when the result is an apparently harsh

consequence to the insured."); Cadwallader, 848 So. 2d at 580 ("[F]or the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable."). We will not apply a presumption in favor of Six Flags against the clear terms in—and only reasonable construction of—the language of the Excess Policies.

Second, the court has previously determined that, under Louisiana law, the presumption does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes its agent to secure desired policy provisions. See McDermott Int'l, Inc. v. Lloyds Underwriters of London, 944 F.2d 1199, 1207 (5th Cir. 1991) ("By having its agent decide upon both the slip and the policy, [the insured] forfeits any benefit from the policy drafter principle."); Sharp, 858 F.2d at 1046 (holding that where the disputed insurance contract clause "was a product of . . . a joint effort, . . . there would be no reason to weigh our construction heavily in favor of coverage"); Calcasieu-Marine Nat'l Bank of Lake Charles, 533 F.2d at 295 n.6, 296 (holding that the presumption "may not be applicable here[,] . . . [where] each party was equally responsible for the policy language"); see also Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261 (5th Cir. 1976) (concluding under Missouri law, based on a manuscript policy "attributable to both parties alike," that "[w]e do not feel compelled to apply, or, indeed, justified in applying the general rule that an insurance policy is construed against the insurer in the commercial insurance field when the insured is not an innocent but a corporation of immense size, carrying insurance with annual premiums in six figures, managed by sophisticated business men, and represented by counsel on the same professional level as the counsel for insurers" (footnote omitted)). But cf. Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co., 857 F.2d 286, 288 (5th Cir. 1988) (refusing to alter the presumption where the insurance broker chose the terms but received no

compensation from the insured and where there was no evidence of the insured's superior bargaining power). Here, the summary judgment evidence, construed in favor of Six Flags, shows that IRI provided Six Flags with the Weather Cat Occurrence definition for inclusion in its primary level policy. Marsh, Six Flags's agent, in turn directed the inclusion of identical language in the Excess Policies. IRI is not an Excess Insurer and not a party to this dispute. Under these circumstances, we cannot apply the presumption against the Excess Insurers, who did not draft the disputed provision, or in favor of Six Flags, which is undisputedly a sophisticated commercial entity that utilized Marsh to secure an insurance package suitable to its unique risks.

Overall, we conclude that the non-Commonwealth Excess Policies unambiguously establish that the Flood sublimit applies to loss and damage as respects Flood caused by, associated with, or occurring in conjunction with Hurricane Katrina.

2.     The Commonwealth Policy

Six Flags argues that the Commonwealth Flood definition endorsement evidences the Excess Insurers' intent to prevent the applicability of the Flood sublimit to loss caused by a Named Storm. In its only relevant departure from the other Excess Policies, the Commonwealth Flood definition endorsement replaces the language to define the term "Flood." It states that:

> The term "flood" is defined as loss or damage caused by waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not. Loss resulting from, contributed to or aggravated by a "flood" caused by a peril not otherwise excluded under this policy shall not be considered in application of the policy "flood" limit or deductible provisions.

Six Flags argues that this endorsement clarifies, for the Commonwealth policy as well as for the non-Commonwealth Excess Policies, that Flood caused by the peril of a Named Storm is not considered in the application of the Flood

sublimit. The Excess Insurers counter that Commonwealth's definition of Flood means only that loss caused by other perils is not subject to the Flood sublimit and the inclusion of the phrase "all whether driven by wind or not," which has been universally interpreted to include hurricane-related flooding, would be rendered ineffective.

We conclude that the Commonwealth Flood definition endorsement creates an ambiguity in the Commonwealth policy but not the non-Commonwealth Excess Policies. One reasonable interpretation of the endorsement, when considered with the entire Commonwealth policy, is that loss resulting from a flood caused by a peril (such as a Named Storm) is not subject to the Flood sublimit. The Excess Insurers do not dispute that Hurricane Katrina was a Named Storm and cannot (at least at this time) dispute that Hurricane Katrina caused the flooding at issue here. Thus, under this interpretation, the Flood sublimit would not apply to loss resulting from the flood at the Six Flags New Orleans theme park caused by Hurricane Katrina.

The Excess Insurers counter that Commonwealth's re-wording was meant only to clarify that loss caused by a separate peril is not subject to the Flood sublimit when that loss also resulted from Flood.[13] Thus, the Excess Insurers

---

[13] The Excess Insurers also argue that the Flood sublimit applies to all flood loss, whether hurricane-related or otherwise, citing Altru Health System v. American Protection Insurance Co., 238 F.3d 961 (8th Cir. 2001); Arjen Motor Hotel Corp. v. General Accident Fire & Life Assurance Corp., 379 F.2d 265 (5th Cir. 1967); and Gilbert/Robinson, Inc. v. Sequoia Insurance Co., 655 S.W.2d 581 (Mo. App. 1983). These cases do not dictate the opposite outcome here. In Arjen, this court considered the collapse of a shoreline building due to hurricane-driven tidal waves. The policy expressly excluded from coverage "any loss" from "tidal water or tidal wave." 379 F.2d at 267. The court thus concluded that the exclusion "serve[d] to restrict . . . the coverage of" the peril of collapse. Id. Here, of course, there is no such clear exclusion or limitation on coverage as the Commonwealth Flood definition endorsement arguably precludes the applicability of the Flood sublimit.

In Altru, the Eighth Circuit held that loss due to business interruption caused by a flood that also resulted in a civil authority order closing the insured's business was subject to the flood sublimit. 238 F.3d at 964. The insured asserted that the civil authority order made a separate, generic limit applicable to the exclusion of the flood sublimit. Id. The Eighth Circuit rejected this argument because the policy expressly provided for the application of the lower

argue that "caused by a peril" modifies "loss"—for Six Flags, "caused by a peril" modifies "flood." Even if this alternative interpretation is reasonable, which we do not decide at this time, the existence of two reasonable alternative interpretations would create an ambiguity in the Commonwealth policy. See Bonin, 930 So. 2d at 911 (holding that a provision in an insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations). While we do not conclude at this time that only one reasonable interpretation is possible, we simply hold that at least one reasonable interpretation favors coverage of the loss from Hurricane Katrina without application of the Flood sublimit. The district court may decide in the first instance whether the Excess Insurers' proposed alternative interpretations are reasonable.[14]

---

limit where two or more limits were applicable and because the section describing civil authority orders cross-referenced the flood coverage provision and its applicable limits. Id. Thus, in Altru, unlike the Commonwealth policy, the policy expressly resolved how to apply multiple applicable sublimits.

Similarly, in Gilbert/Robinson, the Missouri Court of Appeals held that an endorsement that extended policy coverage to business interruption loss was subject to the limit defined in an endorsement that provided protection against the peril of flood because business interruption loss was expressly subject to the limit that controlled the applicable per premises loss contained in the flood endorsement and without that endorsement, the premises would not have been insured against the peril of flood. 655 S.W.2d at 583–84. Thus, unlike the all-risks policy here, the specific provision extending coverage in Gilbert/Robinson provided the applicable limit.

Overall, while Altru, Gilbert/Robinson, and Arjen reach outcomes that the Excess Insurers desire to have replicated here, they stand for nothing more than the application of the clear policy language of their respective contracts. See generally La. Ins. Guar. Ass'n, 630 So. 2d at 763 n.5 ("[I]n interpreting an insurance policy based on prior jurisprudence, the court must carefully compare the language in the policy under scrutiny with that of the policies construed in the prior cases because a difference in verbiage may dictate a difference in outcome.").

[14] The Excess Insurers also argue that Hurricane Katrina was not a separate peril. While they reiterate, as we have concluded above, that the Weather Cat Occurrence provision defines an occurrence, not a peril, they do not dispute that a Named Storm is independently and expressly labeled a peril. Thus, the question is not whether the Flood sublimit applies to Flood aggregated within a Weather Cat Occurrence, which it undoubtedly does; instead, the question is to what extent the peril of a Named Storm—here, Hurricane Katrina—caused the flood that resulted in the loss claimed by Six Flags, thus rendering the Flood sublimit inapplicable pursuant to the Commonwealth Flood definition endorsement. For the present

17

The Excess Insurers also contend that our interpretation of the Commonwealth policy would render ineffective the phrase "all whether driven by wind or not." We have interpreted similar language to exclude coverage for hurricane-caused flooding where the policies at issue expressly deny coverage for flooding caused or contributed to by other perils. See Tuepker, 507 F.3d at 352, 354; Leonard, 499 F.3d at 430, 437–38. The phrase, however, is not rendered ineffective here because the Commonwealth policy does not comparably provide for the applicability of the Flood sublimit if the flooding was caused by another peril and because the endorsement arguably dictates the opposite result.[15] As noted above, a reasonable interpretation of the policy is that water driven by wind is Flood—giving meaning to that provision; however, if that wind-driven Flood is caused by another covered peril, such as a Named Storm, then the Flood sublimit does not apply. Because a reasonable reading of the Commonwealth Flood definition endorsement leads to the conclusion that it excludes the applicability of the Flood sublimit to Flood that was caused by the peril of a Named Storm—in this case, Hurricane Katrina—we therefore reverse the district court's order granting summary judgment to Commonwealth and remand to the district court.[16]

---

appeal, the parties have not disputed that the flooding was caused by Hurricane Katrina.

[15] The Excess Insurers have not briefed whether the phrase "all whether driven by wind or not" is rendered ineffective for any other reason. During oral argument, they did contend that all flooding is caused by other perils, thus an interpretation favoring Six Flags would render the entire Flood sublimit ineffective. We do not subscribe to this proposition. The Excess Policies label Flood as a peril, thus evidencing that Flood, in many circumstances, is the independent cause of certain losses without causation by another peril.

[16] We do not proceed to select between the competing interpretations at this time for three reasons. First, Six Flags did not move for summary judgment in the district court. Second, because the district court concluded the Excess Policies were unambiguous, it terminated Six Flags's discovery and, moreover, did not review the existing extrinsic summary judgment evidence. Third, as noted above, we do not apply a presumption of coverage in favor of a sophisticated corporation represented by an insurance broker and, in any case, it is first appropriate to discern the intent of the parties through extrinsic evidence. See In re Katrina

Six Flags asserts that this conclusion extends to the non-Commonwealth Excess Policies. In particular, it argues that the definition of Flood in the non-Commonwealth Excess Policies should be read in light of the definition contained in the Commonwealth Flood definition endorsement.[17] The non-Commonwealth Excess Policies do not contain a provision that similarly conditions the applicability of the Flood sublimit on the peril causing the flood. Thus, to the extent that the Commonwealth policy differs from the non-Commonwealth Excess Policies, Six Flags asks us to modify the non-Commonwealth Excess Policies to find an ambiguity. We decline to interpret the non-Commonwealth Excess Policies by reference to the Commonwealth Flood definition endorsement. Louisiana statutory rules require that:

> No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance.

LA. REV. STAT. ANN. § 22:867. Thus, our inquiry focuses on whether the Excess Policies incorporate the Commonwealth policy or Commonwealth Flood definition endorsement by specific reference. See Ins. Co. of N. Am. v. Bd. of Comm'rs of Port of New Orleans, 733 F.2d 1161, 1167 (5th Cir. 1984). Sufficient specific references include such phrases as "as per primary policies," id.; "as per Underlying policy(ies) as far as applicable," Heinhuis v. Venture Assocs., Inc., 959 F.2d 551, 552–53 (5th Cir. 1992); or, "the provisions of the immediate underlying policy are incorporated as a part of this policy," Hunter v. Office of

---

Canal Breaches Litig., 495 F.3d at 207 (discussing the reasonable expectation doctrine and article 2053's reference to extrinsic evidence).

[17] Outside of the use of extrinsic evidence related to IRI's policy, the text of which is not in the record, Six Flags has not briefed the relevance of the IRI policy or any difference in its text.

Health Servs., 385 So. 2d 928, 937 (La. Ct. App. 1980). The non-Commonwealth Excess Policies contain no such words of incorporation. The only discussion of the other policies is the Excess Clause, which states that, inter alia, the primary level insurance policies may insure different risks than the Excess Policies, and the Participation Clause, which sets out the proportion of each layer of coverage for which the particular insurer is liable. Like all sophisticated corporations using an agent, Six Flags could have required that its insurers use identical words in all of the applicable policies, but it did not do so in this case. Six Flags has pointed us to no authority supporting the coextensive interpretation of differing policies so long as the insured intended to obtain the same coverage from each policy.[18] At minimum, because it is the Commonwealth Flood definition endorsement's language and not the common provisions of the Excess Policies that creates the ambiguity, we cannot impose that ambiguity on all of the Excess Insurers, particularly here where other Excess Insurers did not incorporate the Commonwealth Flood definition endorsement. We therefore hold that we must review the Excess Policies as independent units.

D. Extrinsic Evidence And The Denial of Plaintiff's Rule 56(f) Motion

Six Flags asks us to consider extrinsic evidence in order to discern the intent of the parties. Extrinsic evidence includes "the nature of the contract, equity, usages, the conduct of the parties before and after formation of the contract, and of other contracts of a like nature between the same parties." LA.

---

[18] While some precedent suggests that the court may construe the Excess Policies together, it ultimately cautions against doing so where we would need to treat the policies as one contract. See, e.g., Northrop Grumman Corp., 2009 WL 861475, at *7 (applying California law and concluding that "though the primary policy must be consulted in interpreting the excess policy, we decline to treat the two documents as only one contract" (citations omitted)); see also, e.g., SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., 467 F.3d 107, 114–15 (2d Cir. 2006) (interpreting "the terms of more than thirty separate insurance contracts that together provide the total coverage" as individual contracts with different definitions of "occurrence" rather than as a single contract). More importantly, under Louisiana law, we construct insurance contracts according to primary sources of law, and section 22:867 controls this case.

Civ. Code Ann. art. 2053. Extrinsic evidence may only be used to clarify ambiguity, not to create an ambiguity in an otherwise clear contract. See Campbell v. Melton, 817 So. 2d 69, 74–75 (La. 2002); see also Blackburn, 784 So. 2d at 641; Doerr, 774 So. 2d at 125.[19] Because we conclude that the non-Commonwealth Excess Policies are not ambiguous, we will not resort to extrinsic evidence to interpret them. Having held that the Commonwealth policy is, at minimum, ambiguous and that remand to the district court is the appropriate outcome here, we conclude that the district court on remand will be in the best position to determine, consistent with our holding today, if reference to extrinsic evidence is necessary in the first instance.

Six Flags finally argues that the district court erred by denying its request to conduct additional discovery pursuant to Rule 56(f).[20] Six Flags seeks additional extrinsic evidence regarding the Excess Insurers' and IRI's intentions that the policies would provide full coverage for loss or damage from a hurricane. The district court concluded that it did not need to grant Six Flags's motion because the Excess Policies were unambiguous; thus, the information Six Flags sought to discover was not essential to deciding the partial motion for summary judgment.

We affirm as to the non-Commonwealth Excess Insurers. "The trial judge's decision to curtail discovery is granted great deference and, thus, is

---

[19] Six Flags did not file a cross-motion for summary judgment in the district court, and the district court specifically refused to consider any of Six Flags's extrinsic evidence after it concluded that the Excess Policies are unambiguous.

[20] Rule 56(f) provides:
If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
    (1) deny the motion;
    (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
    (3) issue any other just order.
Fed. R. Civ. P. 56(f).

reviewed under an abuse of discretion standard." Wichita Falls Office Assocs. v. Banc One Corp., 978 F.2d 915, 918 (5th Cir. 1992). "The purpose of Rule 56(f) is to provide non-movants with a much needed tool to keep open the doors of discovery in order to adequately combat a summary judgment motion." Id. at 919. Although "a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course," Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991) (quotation marks and citations omitted), the party seeking additional discovery must first demonstrate "how that discovery will create a genuine issue of material fact," Beattie v. Madison County Sch. Dist., 254 F.3d 595, 606 (5th Cir. 2001). In this case, the extrinsic evidence that Six Flags seeks to discover will not create a genuine issue of material fact because, as noted above, such evidence may not be used to create an ambiguity in otherwise unambiguous non-Commonwealth Excess Policies. See LA. CIV. CODE ANN. art. 2046; Cadwallader, 848 So. 2d at 581 ("Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms."). Regarding the Commonwealth Policy, because we conclude that an ambiguity exists, reverse summary judgment for Commonwealth, and remand, Six Flags's appeal is moot. Further discovery may be helpful, and the district court will be in the best position to control that discovery before entertaining any future motions.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND. We AFFIRM the district court's entry of judgment for Westchester Surplus Lines Insurance Co.; Arch Specialty Insurance Co.; Great Lakes Reinsurance (UK) PLC; Axis Specialty Insurance Co.; Continental Casualty Co.; and Liberty Corporate Capital, Ltd. We REVERSE the district court's entry of judgment for Commonwealth Insurance Co. and REMAND for proceedings

between Six Flags and Commonwealth consistent with this opinion. Costs incurred by the non-Commonwealth Excess Insurers shall be borne by Six Flags. Six Flags and Commonwealth shall bear their own costs.