# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 24, 2021

Lyle W. Cayce
Clerk

No. 20-30140
CONSOLIDATED WITH
No. 20-30175

McDonnel Group, L.L.C.,

*Plaintiff—Appellant*,

Jung, L.L.C.,

*Intervenor Plaintiff—Appellant*,

*versus*

Starr Surplus Lines Insurance Company;
Lexington Insurance Company,

*Defendants—Appellees*,

_____

All Star Electric Incorporated,

*Plaintiff—Appellant*,

*versus*

Starr Surplus Lines Insurance Company;
Lexington Insurance Company,

*Defendants—Appellees*,

No. 20-30140
c/w No. 20-30175

_____

Jung, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Starr Surplus Lines Insurance Company;
Lexington Insurance Company,

*Defendants—Appellees*,

_____

Mechanical Construction Company, L.L.C.,
*now known as* Bernhard MCC, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Starr Surplus Lines Insurance Company;
Lexington Insurance Company,

*Defendants—Appellees*.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
No. 2:18-CV-1380
No. 2:19-CV-10462
No. 2:19-CV-2227
No. 2:19-CV-2230

_____

No. 20-30140
c/w No. 20-30175

Before Smith, Clement, and Oldham, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

The McDonnel Group ("McDonnel") served as the general contractor for the renovation of the Jung Hotel and Residences ("Jung"). McDonnel purchased insurance from the insurer defendants. During the renovation, the project flooded, resulting in over three million dollars in damage. The insurers denied the claim, contending that the full amount fell below the flood deductible.

McDonnel, its subcontractors, and Jung (together "plaintiffs") interpret the deductible differently, contending that most of the damage was covered, and sued for declaratory relief and bad-faith damages. The district court granted partial summary judgment for the defendants, determining that the policy is unambiguous and adopting the defendants' interpretation. The plaintiffs appeal. Because the policy is ambiguous, we reverse the summary judgment and remand.

I.

Beginning in 2014, McDonnel served as the general contractor for the renovation and redevelopment of Jung's property ("the project").[1] In early 2015, McDonnel took out insurance from Starr Surplus Lines Company and Lexington Insurance Company (jointly, the "insurers").

During the spring and summer of 2017, the project suffered a number of water intrusions, culminating in a heavy rain that caused extensive damage. McDonnel submitted a notice of loss to the insurers, claiming damages of

---

[1] The other plaintiffs—Mechanical Construction Co., L.L.C., and All Star Electric, Inc.—were subcontractors for McDonnel.

3

$3,226,164.30.

The parties' divergent views on the proper deductible give rise to the dispute. The plaintiffs assert that the correct flood deductible is $500,000 and that the insurers should therefore pay a claim of $2,726,164.30—the flood damage less $500,000. The insurers contend that the proper deductible is $3,443,475. Thus, the claim, in their view, fell $217,310.70 below the deductible, entitling the plaintiffs to nothing under the policy.

McDonnel sued in February 2018. The plaintiffs moved for partial summary judgment, requesting that the district court adopt their interpretation of the flood deductible amount, and the insurers filed an opposition and a cross-motion for summary judgment. On February 11, 2020, the court granted the insurers' cross-motion and denied the plaintiffs' motions. The court determined that the policy language was "clear and unambiguous" regarding the flood deductible and adopted the insurers' interpretation.

The plaintiffs moved for certification of interlocutory appeal under 28 U.S.C. § 1292(b), an entry of final judgment under Federal Rule of Civil Procedure 54(b), and a motion to continue trial. The district court granted the motion, giving rise to this appeal.

## II.

### A.

We review a summary judgment *de novo*. *See, e.g.*, *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 506, 509 (5th Cir. 2011). Moreover, "[b]ecause the proper interpretation of an insurance policy presents a legal question, not a factual one, the district court's interpretations of the [p]olicy are also reviewed de novo." *Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016).

No. 20-30140
c/w No. 20-30175

B.

The parties agree that the policy is governed by Louisiana law.  Therefore, we look to the decisions of the Supreme Court of Louisiana, and, in the absence of on-point caselaw, "must make an *Erie* guess."  *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009).

Under Louisiana law, an "insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."  *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).  The insured party bears the burden "to prove the incident falls within the policy's terms."  *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000).

Words in a contract are normally interpreted according to their "generally prevailing meaning," but "[w]ords of art and technical terms" are given their "technical meaning when the contract involves a technical matter."  LA. CIV. CODE art. 2047 (2021); *see also Cadwallader*, 848 So. 2d at 580 (stating that article 2047 applies to insurance policies).  "An insurance policy . . . should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."  *Whitehead v. Curole*, 277 So. 3d 409, 414 (La. Ct. App. 2019).

Where a policy is ambiguous, it is "generally construed against the insurer and in favor of coverage."  *Cadwallader*, 848 So. 2d at 580 (citing LA. CIV. CODE art. 2056 (2021)).[2]  A policy provision is ambiguous only if it "is

---

[2] *See also Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512–13 (5th Cir. 2014) ("If the insurance contract terms are ambiguous, these ambiguities are generally strictly construed against the insurer and in favor of coverage."); *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994) ("If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the

5

susceptible to two or more *reasonable* interpretations." *Id.* Courts may not "authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists . . . when the terms express with sufficient clearness the parties' intent." *Whitehead*, 277 So. 3d at 414–15.

Where "a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007). Where there is an ambiguity in the policy, however, "the court may look to extrinsic evidence to determine the parties' intent." *Doerr*, 774 So. 2d at 124. "Each provision . . . must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE art. 2050 (2021).

## III.

The sole issue is whether the flood deductible is ambiguous.[3] It is.

## A.

The insurance policy originally valued the project and insured it for $76,086,833. That amount was increased, via multiple endorsements, to $86,086,833. The deductibles, sub-limits, and term aggregate limits, however, remained unchanged from the original policy. As relevant here, the policy included a term aggregate limit of liability, confining the amount that

---

insured.").

[3] McDonnel presents the issues differently, breaking out essentially the same question into three issues: whether the district court erred by concluding that the flood deductible was clear and unambiguous; whether the court erred in failing to find that the deductible was unambiguous in favor of McDonnel and Jung's interpretation; and whether the court erred by failing to find that the deductible was ambiguous. But those questions boil down to a core issue—whether the district court's determination that the flood deductible was unambiguous was correct under Louisiana law.

No. 20-30140
c/w No. 20-30175

the insured parties could claim from flood damage to $10,000,000.[4]  The policy also included a deductible for flood damage of "5% of the total insured values at risk at the time and place of loss subject to a **$500,000 minimum deduction as respects as respects** [*sic*] **FLOOD\*.**"

## B.

The correct deductible amount, and thus the millions of dollars at stake, hinge on the correct interpretation of "5% of the total insured values at risk."  McDonnel contends that, because of the flood sub-limit, "the maximum amount that an insured . . . could ever recover for a claim arising from flood damage is $10 million."  Thus, "the total amount insured"—the "total insured values at risk"—for flood damage was limited to $10,000,000.  Under the plaintiffs' interpretation,[5] therefore, the deductible is $500,000.[6]

The insurers, to the contrary, assert that the deductible is much higher.  In their view, the term "total insured values" refers to the value of the entire project: $68,869,506.[7]  Because the deductible for the flood sub-limit is 5% of the total insured value, the deductible is $3,443,475.[8]

The difference in interpretations reduces, in large part, to the interpretation of a key sentence of the flood deductible.  Essentially, the plaintiffs read the deductible as saying "5% of the total insured values at risk . . . as

---

[4] The policy states that "[T]he maximum amount this Company will pay for loss or damage . . . in any one policy term shall not exceed the following amounts for loss caused by the following perils . . . **$10,000,000** by the peril of **FLOOD\*** – Term Aggregate."

[5] Jung makes a similar argument regarding the correct deductible.

[6] $500,000 is both 5% of $10,000,000 and the minimum deductible per the policy.

[7] The insurers calculate that amount because the entire project value was $86,086,883, and the project was 80% complete at the time of the flood.  So 80% of $86,086,883 is $68,869,506.

[8] So 5% of $68,860,506 is $3,443,475.

No. 20-30140
c/w No. 20-30175

respects FLOOD," and the insurers read the provision as "5% of the total insured values at risk at the time and place of loss, subject to a $500,000 minimum deduction . . . as respects FLOOD." In other words, under the plaintiffs' theory, "as respects FLOOD" modifies "total insured values at risk." Under the insurers' theory, "as respects FLOOD" pertains only to the "$500,000 minimum deduction." Both parties' interpretations are reasonable, so the policy is ambiguous. *See Cadwallader,* 848 So. 2d at 580.

## C.

The plaintiffs rely heavily on *Terra-Adi International Dadeland, LLC v. Zurich American Insurance Co.*, No. 06-22380-CIV-HUCK/SIMONTON, 2007 WL 675971 (S.D. Fla. Mar. 1, 2007). In *Terra-Adi*, the district court interpreted a policy provision similar to the one here. It included a sub-limit of $10,000,000 for damage from windstorms and stated the following deductible: "5% of the total insured values at risk at the time and place of loss subject to a minimum deduction of $250,000, as respects the peril of WINDSTORM." *Id.* at *3.

The court in *Terra-Adi* determined that the insured's interpretation of the policy was reasonable: Because the $10,000,000 sub-limit was the maximum total insured value at risk for windstorms, the correct deductible calculation was 5% of $10,000,000 instead of the insured value of the entire project. *See id.* The court observed that the insurer's contention that the term "total insured values at risk" referred to "the aggregate value of physical property insured under the [policy]—not merely the value of the property insured against the peril of windstorm"—was a "different, but also reasonable" interpretation. *Id.* at *4. Florida law, like Louisiana law, commands that where "more than one interpretation of a policy provision is possible, [the court] must resolve the ambiguity against the insurer who drafted the language of the insurance contract." *Id.* at *2 (citing *Allstate Ins. Co. v. Swain,*

921 So. 2d 717, 719 (Fla. Dist. Ct. App. 2006)). Thus, the court granted summary judgment to the insured party. *See id.* at \*5. Interpreting a nearly identical deductible, we determine that the language is ambiguous here too.

The insurers do not contest that *Terra-Adi* is directly on point and supports the plaintiffs' interpretation. Instead, the insurers minimize the import of that ruling, characterizing it as "an unreported opinion from the Southern District of Florida handed down over thirteen years ago" and correctly noting that it is not binding. Moreover, the insurers contend that *Terra-Adi* is an outlier even within its own jurisdiction, pointing to *El-Ad Enclave at Miramar Condominium Association Inc. v. Mt. Hawley Insurance Co.*, 752 F. Supp. 2d 1282 (S.D. Fla. 2010). But that case involved policy language different from the policy here.[9] Indeed, another opinion highlighted the difference between the policy language in *Terra-Adi* and in *El-Ad*, observing, "*Terra-ADI* did not involve the same language at issue . . . in *El-Ad*." *Arbor Keys Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, No. 10-62008-CIV-SEITZ/SIMONTON, 2011 WL 13097298, at \*8 n.7 (S.D. Fla. Oct. 6, 2011).

The insurers also point to *Castle Oil Corp. v. Ace American Insurance Co.*, 137 A.D.3d 833 (N.Y. App. Div. 2016). In that case, the court also determined whether to calculate a policy deductible as a percentage of a sub-limit or, instead, of a broader, aggregate amount at risk. *See id.* at 834–37. The policy "provided that '2% of the total insurable values at risk per location subject to a minimum of $250,000' would be deducted from each adjusted claim arising out of a flood 'occurrence.'" *Id.* at 834. The court concluded that the deductible should not be calculated based on 2% of the relevant sub-limit because "the average insured could have only one reasonable expec-

---

[9] In *El-Ad Enclave*, 752 F. Supp. 2d at 1288, the relevant policy provision stated that "the 'peril deductible' is $10,000 per occurrence for all 'covered perils,' except '3.00% of total values at risk Per Building . . . at the time of loss for Winstorm [*sic*] or Hail."

tation as to the meaning of the phrase 'total insurable values at risk,' namely, its own risk of loss and damage." *Id.* at 837. The insurers urge the same interpretation and outcome here.

McDonnel, on the other hand, emphasizes that the policy language in *Castle Oil* used the term "total insur**able** values at risk," but the policies in *Terra-Adi* and here used the term "total insur**ed** values at risk." McDonnel correctly points out that this court has acknowledged that those terms may have different meanings. *See Saratoga Res., Inc. v. Lexington Ins. Co.*, 642 F. App'x 359, 362 (5th Cir. 2016) (per curiam).[10] The plain meaning of the terms also suggests a difference—"insurable values" is the total value that the insurance *could* have insured, and "insured values" is the total value for which the insured actually purchased coverage.[11] Moreover, unlike the policy here, the policy in *Castle Oil* did not include a modifier comparable to "as respects flood." Thus, McDonnel is correct that the present policy is meaningfully different from the policy in *Castle Oil*.[12]

---

[10] *Saratoga Resources* suggests, 642 F. App'x at 362, that there may be a difference between "total insurable values" and "total insured values." The court noted that the insured asked the court to interpret the terms "insurable" and "insured" as having the same meaning. *Id.* The court "[p]ut[] aside" the question of whether the terms had the same meaning, leaving open the possibility that they are meaningfully different. *See id.*

[11] *Cf. Castle Oil*, 137 A.D.3d at 836–37. "[I]n deciding how much coverage to seek, a primary concern of the average insured is the value of what is at risk . . . . *How much insurance the average insured chooses to obtain is not the same as the 'total insurable values at risk*." *Id.* (emphasis added).

[12] The insurers also cite *Beverly Hills Condominium 1-12, Inc. v. Aspen Specialty Insurance Co.*, No. 06-60980-CIV, 2007 WL 1183939 (S.D. Fla. Feb. 1, 2007). The policy in that case is distinguishable for the same reasons as is the policy in *Castle Oil*, using the term "total insurable values." *Id.* at *2. Moreover, the policy in *Beverly Hills Condominium* explicitly defined the term "insurable values at risk" to include all the property at risk instead of individual units. *Id.* at *4. The policy here omits such a definition.

D.

"An insurance contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Sims*, 956 So. 2d at 589. The rest of the policy sheds little light on the deductible in question. Outside of the deductibles provision, the term "total insured value" appears only twice. Both times, it refers to the value of the project. That lends some credence to the insurers' interpretation of the deductible, although the fact that the "as respects flood" modifier is absent in the other uses of the term still leaves the meaning unclear.

Furthermore, the term "total insured values" is not included in the definitions section of the policy. Instead, that section includes a definition for the "Total Contract Value"—the "total value of all property insured . . . which will become part of or will be expended in the project." That term, in contrast to "total insured values," appears frequently throughout the policy. The predominant use of "Total Contract Value" to denote the value of the entire project indicates that the policy, read in its entirety, does not provide clarity regarding the term "total insured values at risk . . . as respects flood."

E.

Both the plaintiffs and the insurers contend that, unless the deductible is read according to their respective interpretation, absurd results would ensue. Under Louisiana law, "an insurance policy . . . should not be interpreted in an unreasonable or strained manner . . . so as to achieve an absurd conclusion." *Whitehead*, 277 So. 3d at 414.[13]

McDonnel asserts that the insurers' interpretation would lead to

---

[13] *See also Six Flags*, 565 F.3d at 954. Under Louisiana law, where "the words of a contract are clear and explicit *and lead to no absurd consequences*, no further interpretation may be made in search of the parties' intent." *Id.* (quoting LA. CIV. CODE ANN. art. 2046) (emphasis added).

absurd results because, although the flood sub-limit was fixed at $10,000,000, the total project coverage amount increased 8%, causing the flood deductible to increase while the amount covered for floods remained static. McDonnel points out that, theoretically, it would be possible for the flood deductible to exceed the sub-limit.[14] That result does seem at least inequitable, if not absurd.[15]

The insurers, on the other hand, point out that under the plaintiffs' interpretation, $500,000 is both the minimum and the maximum deductible for flood damage. The insurers aver that that result is problematic because the policy states that $500,000 is the *minimum* deductible. But, because 5% of the $10,000,000 sub-limit is also $500,000, that amount is both the minimum and maximum deductible under the plaintiffs' theory.

The insurers' contention that the deductible is absurd would be stronger if the sub-limit were *less* than $10,000,000 with the plaintiffs contending that the minimum deductible was higher than any theoretical maximum. But setting $500,000 as both the minimum and the maximum deductible is not absurd—it merely means that $500,000 is the deductible. Moreover, McDonnel points out that, early in the project, there may have been less than $10,000,000 in covered property. Thus, it is likely that 5% of the total insured values would have been less than the $500,000 minimum for some duration of the project.

---

[14] That eclipse would occur if the total project coverage reached $200,000,000 because 5% of $200,000,000 is $10,000,000, the amount of the sub-limit.

[15] *Cf. Penthouse Owners Ass'n v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 387 (5th Cir. 2010) ("The purpose of a deductible is to shift some of the insurer's risk (that is, *covered risk*), to the insured, which is accomplished by setting a limit on the value of *covered* losses below which the insurer is not obligated to pay." (emphases added)).

No. 20-30140
c/w No. 20-30175

IV.

The parties introduce extrinsic evidence to support their respective policy interpretations.

A.

Extrinsic evidence is admissible to resolve a contractual ambiguity under Louisiana law. *See Bd. of Supervisors of La. State Univ. v. 2226 Canal St., L.L.C.*, 262 So. 3d 909, 914. (La. Ct. App. 2018). McDonnel points to correspondence from its insurance broker informing it "that the deductible for flood would be $500,000.00." Jung points to similar correspondence from the broker, both before and after the parties contracted. The insurers, on the other hand, introduce three pieces of extrinsic evidence, including "Binders" that were issued before the final policy was signed.[16]

The district court determined that the policy was unambiguous and did not analyze any extrinsic evidence in interpreting the policy. Thus, because we conclude that the policy was ambiguous, we remand for the district court to determine whether extrinsic evidence resolves the ambiguity. *See, e.g.*, *Six Flags*, 565 F.3d at 961 n.16.

B.

On remand, the district court should also determine whether the presumption in favor of coverage in the case of an ambiguity applies here. That presumption is not automatic, and "under Louisiana law, the presumption [in favor of the insured] does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes its agents to secure desired

---

[16] The timing of the extrinsic evidence could be significant: "Parol evidence should only be used to determine the intentions of the parties at the time the contract was made, not after the fact." *Stewart Enters. v. RSUI Indem. Co.*, 614 F.3d 117, 124 (5th Cir. 2010) (per curiam).

policy provisions." *Id.* at 958.[17] It is uncertain from the briefing whether the plaintiffs fall into that exception to the presumption, and we indicate no view on whether their level of sophistication or any involvement in negotiating the policy satisfies the exception.

The policy is ambiguous. The summary judgment is REVERSED and REMANDED. We set no limits on what proceedings the district court should conduct on remand, and we do not mean to intimate what decisions it should reach.

---

[17] *See also Certain Underwriters at Lloyds London v. Perraud*, 623 F. App'x 628, 631 (5th Cir. 2015) (noting that most courts, including courts interpreting Louisiana law, take a "middle ground, deeming the exception [to the presumption in favor of the insured] triggered where the insured—or a broker acting on the insured's behalf—actually negotiates, drafts, or proposes portions of the policy.").